IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOHNATHAN D. WISHNESKI,

        Plaintiff,

v.                                       CV 08-0348 MCA/WPL

DOÑA ANA COUNTY ET AL.,

        Defendants.

### PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

This matter is before me on four *Martinez* reports and related responses and replies.  I previously advised the parties that **"the *Martinez* reports may be used in deciding whether to grant summary judgment, either by motion or *sua sponte*.  Therefore, the parties should submit whatever materials they consider relevant to Wishneski's claims."**  (Doc. 196 at 5 (emphasis in original).)[1]

Under the well-known standard, summary judgment should be granted when the record demonstrates "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c)(2).  The record and all reasonable inferences therefrom must be viewed in the light most favorable to the nonmovant.  *See Muñoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000).  A court cannot resolve material disputed factual issues by accepting a *Martinez* report's factual findings when they are in conflict with pleadings or affidavits.  *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991).  Having reviewed

---

[1] In their answer, the County Defendants raised the affirmative defenses of qualified immunity and failure to exhaust administrative remedies, but they did not provide any information regarding these defenses in their *Martinez* report.  Therefore, the defenses are not considered in this PFRD.

the record and the relevant law, I make the following recommendations regarding the pending claims of Johnathan D. Wishneski.

### ACCESS TO INFORMATION CLAIMS

Wishneski asserts that he was denied access to books, magazines, and newspapers because the Detention Center does not have a library and prohibits the receipt of these items by mail.  (Doc. 1 at F-5, F-21.)  He alleges that "late in 2007 a notice was posted the [sic] said – Due to the overwhelming amount of books, magazines, etc. that are being mailed into this facility we are no longer able to keep up with and inspect these items and consequently they will no longer be allowed to be sent to this facility."  (*Id.* at F-5.)  He further asserts that the Detention Center does not allow prisoners to watch "local news and television channels."  (*Id.*)

A county may be held liable under § 1983 if one of its policies injures the plaintiff.  *See Herrera v. County of Santa Fe*, 213 F. Supp. 2d 1288, 1290 (D.N.M. 2002).  It is undisputed that Aramark provides mail services at the Detention Center.  (*See* Doc. 196 at 2.)  If a corporation contracts with a county to operate the county's detention center, both the county and the corporation may be held liable when the corporation promulgates an unconstitutional policy that injures the plaintiff.  *See Herrera*, 213 F. Supp. 2d at 1290, 1292.  Because it was not clear whether the County or Aramark was responsible for the Detention Center's mail policies, I ordered both of them to address Wishneski's allegations regarding mail.  Aramark and the County attached mail policies to their *Martinez* reports.  On their face, the policies show that they are part of the Detention Center's operations manual.  They were signed by the Detention Center's director.  Moreover, Aramark has submitted an affidavit by an administrative assistant who oversees mail services at the Detention Center.  He avers that Aramark does not have policies or procedures regarding television channels.  (Doc. 218 Ex. A at 2.)  Wishneski has offered no evidence that any of the policies affecting his

access to information were promulgated by Aramark.  I therefore recommend that summary judgment be granted in Aramark's favor on these claims.

The County admits that the Detention Center does not have a library.  But it asserts in the unsworn portion of its *Martinez* report that inmates have access to the public library.  (Doc. 219 at 6.)  To support this assertion, the County cites Exhibit 7 to the *Martinez* report.  Exhibit 7 is the Detention Center's library policy.  This policy does not refer in any way to accessing a public library.  Instead, it reads as if the Detention Center has an on-site library.  For example, it states that a program specialist will "coordinate and oversee library services by," among other things, establishing the hours of operation and "[i]nstituting methods of operation," "[s]electing, acquiring, classification, organization and circulation of library materials," and "[t]rain[ing] and supervis[ing] civilian library staff and detainee library aides." (*Id.* Ex. 7 at 1.)

In his response to the *Martinez* reports, Wishneski states that the inmate handbook does not advise inmates that they can access the public library.  He demands proof as to how inmates are made aware of this policy and proof that such a policy is really in effect, such as library request forms.  The County declined to supply such proof in its reply.

The County's *Martinez* report does not establish that inmates have any type of library access.  As noted above, the library policy does not mention public library access.  Although the policy indicates that there is an on-site library, the County has conceded that there is none.  The unsworn assertion of the County's attorney that inmates have access to the public library under this policy does not make it so.  Moreover, the policy is dated July 31, 2008.  Wishneski was incarcerated at the Detention Center from April 2007 to early November 2008.  The County has provided no proof of any type of library policy for most of the time that Wishneski was there.

Regarding publications, the County's *Martinez* report includes a policy dated September 2008.[2]  (Doc. 219 Ex. 8.)  The policy prohibits newspapers or copies of newspapers "due to fire hazard and media coverage of detainees in custody who may be harmed due to the nature of the offense."  (*Id.* Ex. 8 at 2.)  In addition, the policy states that the Detention Center "does not allow for publications, magazines, or books to be mailed into the facility."  (*Id.* Ex. 8 at 1.)  The County also provided a copy of an email from a captain at the Detention Center to unknown recipients stating, "Effective September 1, 2007, we will no longer be accepting books and magazines sent through the mail to the inmates.  Due to the increasing attempts of trying to get contraband into the facility and the man hours it takes to sort through these packages, we simply cannot do this anymore."  (*Id.* Ex. 11.)  The effective date of September 1, 2007 roughly jibes with Wishneski's allegation that a notice was posted in late 2007.

The County admits that it has a policy precluding inmate access to local news because the media could focus on a story involving an inmate, which could then create problems with other inmates. (Doc. 219 at 8.)  Prisoners are limited to TNT, TBS, Discovery, and "some Spanish channels."  (*Id.*)

In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court recognized that although prisoners have First Amendment rights, those rights are subject to greater restrictions than are allowed for non-prisoners.  *Beard v. Banks*, 548 U.S. 521, 528 (2006) (citing *Turner*, 482 U.S. at 84-85, 93).  Because courts owe substantial deference to the decisions of prison administrators, First

---

[2] The report also contains a policy dated March 2001.  (Doc. 219 Ex. 12.)  Without explanation, the County only cites to the 2008 policy in response to Wishneski's mail claims involving publications and only cites to the 2001 policy in response to Wishneski's mail claims not involving publications.  Other than the prohibition on the receipt of publications, the policies do not appear to have any meaningful differences as they relate to Wishneski's claims.

Amendment restrictions are allowed if they are reasonably related to legitimate penological objectives, rather than an "exaggerated response" to those objectives. *Id.* (quoting *Turner*, 482 U.S. at 87).

To test the validity of a prison regulation that impinges on First Amendment rights, *Turner* requires courts to answer the following questions:

> First, is there a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it? Second, are there alternative means of exercising the right that remain open to prison inmates? Third, what impact will accommodation of the asserted constitutional right have on guards and other inmates, and on the allocation of prison resources generally? And, fourth, are there ready alternatives for furthering the governmental interest available?

*Id.* at 529 (internal punctuation and citations omitted).[3]

The prisoner bears the ultimate burden of disproving the validity of the regulations. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003); *Jones v. Salt Lake County*, 503 F.3d 1147, 1159 (10th Cir. 2007). But the defendants have the burden of setting forth a legitimate governmental objective to justify the regulation and of demonstrating that they could have rationally seen a connection between the policy and the objective. *Jones v. Brown*, 461 F.3d 353, 360 (3d Cir. 2006) (citing, among other cases, *Turner*, 482 U.S. at 89). Although this burden has been described as "slight," the defendants must offer more than a conclusory assertion. *Id.* In some cases, the connection may be a matter of common sense; in others, evidence may be required. *Id.* at 361.

In general, prisoners have a First Amendment right to access reading materials and news sources. *See Jacklovich v. Simmons*, 392 F.3d 420, 426 (10th Cir. 2004) ("Inmates have a First Amendment right to receive information while in prison to the extent the right is not inconsistent

---

[3] The *Turner* factors apply to pretrial detainees, and to jails as well as prisons. *See Jones v. Salt Lake County*, 503 F.3d 1147, 1155 n.7 (10th Cir. 2007); *Hause v. Vaught*, 993 F.2d 1079, 1081-82 (4th Cir. 1993).

with prisoner status or the legitimate penological objectives of the prison."). The Detention Center severely encumbers this right by failing to provide access to a library, preventing inmates from viewing local news on television, banning newspapers entirely, and prohibiting the receipt of all other publications, such as books and magazines, by mail.

Regarding the first *Turner* question, the County offers no reason for failing to provide library access. It asserts that the other limitations are justified by the risk of fire, the risk of harm to certain inmates if the nature of their offenses is revealed, and the risk that contraband may be smuggled into the facility.

Courts have rejected the fire hazard rationale for banning publications. *See, e.g., Prison Legal News v. Lehman*, 397 F.3d 692, 700 (9th Cir. 2005); *Thomas v. Leslie*, Nos. 97-3346, 97-3361, 1999 WL 281416, at *7 (10th Cir. April 21, 1999); *see also* 2 MICHAEL B. MUSHLIN, RIGHTS OF PRISONERS § 6.9, at 28 (4th ed. 2009) (stating that courts have properly struck down rules that prohibit the receipt of daily newspapers despite the argument that they constitute a fire hazard). In considering whether there is a rational connection between banning newspapers and preventing fires, it is notable that the Detention Center already limits the personal property that prisoners may keep in their pods and cells (*see* Doc. 219 Ex. 10, 22). *See Lehman*, 397 F.3d at 700 ("[I]t is irrational to prohibit prisoners from receiving bulk rate mail and catalogs on the theory that it reduces fire hazards because the DOC already regulates the quantity of possessions that prisoners may have in their cells."). Moreover, Wishneski states that "shakedowns" occur approximately every two weeks, so it would be difficult to accumulate a large number of newspapers.

The fire hazard rationale is not the County's only justification for prohibiting newspapers. The County also justifies the newspaper ban, as well as the local-television-news ban, on the objective of inmate safety. The County suggests that the safety of some detainees could be in

jeopardy if other prisoners read or see news reports about the nature of their offenses.  The County has not submitted any evidence to back up this rationale, and I am not aware of any case law supporting it.  Nevertheless, common sense supports a connection between inmate safety and local news reports.  Unlike a prison setting, where inmates have already been convicted and do not necessarily come from the local area, a county detention center typically houses people who have just been arrested in the area and whose trials are pending.  This is the most likely time for local media to report on an inmate's alleged crime.  Accordingly, the County has put forward a rational connection between the prohibition on local news and the legitimate governmental objective of inmate safety.

A different justification is offered for the Detention Center's prohibition on mailed publications.  The County asserts that the purpose of this prohibition is to prevent contraband.  The Supreme Court has recognized that hardback books create "an obvious security problem" because they are "difficult to search effectively," yet they are "especially serviceable for smuggling contraband into an institution; money, drugs, and weapons easily may be secreted in the bindings." *Bell v. Wolfish*, 441 U.S. 520, 550-51 (1979).  Therefore, the Court held that a "publisher-only" rule for hardback books does not violate the First Amendment.  *Id.*  Under such a rule, inmates may only receive books that are mailed directly from the publisher or a similar source, such as a book club or bookstore.  *See Jones*, 503 F.3d at 1157.  Expanding on *Bell*, the Tenth Circuit upheld a rule that only allowed inmates to obtain paperback books from the jail library and, with official permission, from the publisher.  *Id.* at 1158-59.  The court held that the rule was rationally related to the legitimate objective of prison security in that it prevented contraband from being smuggled into the jail.  *Id.* at 1158.  Similarly, other circuits have upheld publisher-only rules regarding paperback books, newspapers, and magazines.  *See id.* (citing cases).

In this case, the Detention Center has instituted a complete ban on all publications sent through the mail—prohibiting even publications sent directly from the publisher. The Seventh Circuit has held that maintenance of security or discipline cannot "justify the wholesale prohibition of hard-bound books." *Jackson v. Elrod*, 881 F.2d 441, 445 (7th Cir. 1989) (internal punctuation omitted). However, the ban at issue here, although overbroad, is at least arguably related to the prevention of contraband under *Bell* and *Jones*. I will therefore assume that the first *Turner* question can be answered affirmatively as to this ban.

The second *Turner* question asks whether alternative means of exercising the right remain open to inmates. The Tenth Circuit has stated that the "alternatives need not be ideal; they need only be available." *Jones*, 503 F.3d at 1153. Here, alternatives are quite simply unavailable. With the exception of TNT, TBS, Discovery, and "some Spanish channels," Doña Ana County inmates experience a complete media blackout.[4] The unnamed "Spanish channels" might provide news programming, but this programming is obviously inaccessible to inmates who do not speak Spanish. And in any event, "the ability to listen to the radio or watch television is not an adequate substitute for reading newspapers and magazines." *Jacklovich*, 392 F.3d at 431.

In upholding restrictions on published information, courts typically note the ample alternatives that remain. In *Bell*, for example, hardback books could be received from publishers, bookstores, and book clubs; magazines and paperback books could be obtained from any source; and the facility had a relatively large library. 441 U.S. at 551-52. In *Jones*, the Tenth Circuit upheld the paperback book policy described above, as well as a ban on sexually explicit magazines and

---

[4] Although the Detention Center only expressly prohibits the receipt of books and magazines by mail, there does not appear to be any other way that inmates could receive these publications. I note that the Detention Center's visitation rules forbid visitors from taking anything into the visitation area. (Doc. 219 Ex. 1 at 2.)

technical publications.   The court noted that despite these restrictions, "a broad range" of publications were allowed.  *Jones*, 503 F.3d at 1156.  The jail library contained thousands of books, and inmates could also obtain books from a bookstore through a public donation procedure. Newspapers were permitted too.  *Id.* at 1155-59.

The third *Turner* question examines the impact that accommodation of the right would have on guards, on other inmates, and on the allocation of prison resources.  If the right can only be accommodated "at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike, the courts should defer to the informed discretion of corrections officials." *Thornburgh v. Abbott*, 490 U.S. 401, 418 (1989) (internal quotation marks and citations omitted). In considering the effect of accommodating the right, the Tenth Circuit has held that it is permissible to consider whether similar facilities have accommodated the right.  *Jacklovich*, 392 F.3d at 432. Case law is replete with examples of prisons and jails that have managed to allow at least some access to publications.  By contrast, I am aware of no case in which a complete ban on all written materials was upheld.  *See* MUSHLIN, *supra*, § 6.9, at 27-28 (stating that a categorical prohibition on receipt of newspapers or certain magazines would be "facially unconstitutional").

The fourth question asks whether there are ready alternatives for furthering the governmental objective.  "This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint."  *Turner*, 482 U.S. at 90-91.  The issue is "whether obvious, easy alternatives exist that fully accommodate inmates' rights at *de minimis* cost to valid penological interests.  If so, the regulation may not be reasonable but an 'exaggerated response' to prison concerns."  *Jones*, 503 F.3d at 1154 (quoting *Thornburgh*, 490 U.S. at 418).

9

Again, a review of case law demonstrates that there are ready alternatives that would further the County's objectives while allowing prisoners some access to information. Wishneski proposes two alternatives. First, he notes that a publisher-only rule would alleviate concerns regarding contraband. Second, he suggests that limiting inmates to national news sources, such as *USA Today* and CNN, could prevent the safety risks associated with local news. The County does not address the publisher-only suggestion, but it states that it would have to pay for cable to provide CNN and that the *USA Today* would not be "cost effective" for the same reason. (Doc. 237 at 8.) The County is already providing cable stations, and it does not explain why it would cost more to provide CNN in addition to these stations, or in lieu of one of them. Furthermore, no one is suggesting that the Detention Center must provide free national newspapers to inmates. Providing a well-stocked library, including newspapers, would certainly be one method of accommodating prisoners' First Amendment rights, but no particular method is required. The County does not explain why it would not be cost-effective to allow prisoners themselves to subscribe to national newspapers from the publishers.

In summary, there is no genuine issue of material fact regarding the County's policies relating to access to information. There is no evidence that prisoners have access to publications, and it is undisputed that the Detention Center does not have a library and prohibits prisoners from watching local news and from receiving any publications by mail. The Detention Center's total ban on the receipt of published information by prisoners is unconstitutional under the legal test set forth in *Turner v. Safley*. I therefore recommend that summary judgment be granted in favor of Wishneski on this claim.

In his complaint, Wishneski requests unspecified "monetary damages." (Doc. 1 at F-21.) Other than the fact that he was denied access to information, Wishneski does not allege that he

suffered any harm from the County's unconstitutional policies.  Although the deprivation of First Amendment rights is a type of injury in itself, "[t]he deprivation of constitutional rights, standing alone, does not entitle a plaintiff to general damages.  Plaintiffs must demonstrate actual injury to recover damages under Section 1983 for violation of their constitutional rights."  *Lippoldt v. Cole*, 468 F.3d 1204, 1220-21 (10th Cir. 2006) (internal citations and quotation marks omitted). "[N]ominal damages, and not damages based on some undefinable value of infringed rights, are the appropriate means of vindicating rights whose deprivation has not caused actual, provable injury." *Id.* at 1221 (quoting *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 n. 11 (1986)). Accordingly, I recommend that Wishneski be awarded $1.00 in nominal damages.

### OTHER MAIL CLAIMS

Wishneski has several additional complaints about the Detention Center's mail policies.  He alleges that Detention Center staff read incoming mail, including legal mail, and that staff even take notes regarding legal mail.  The Detention Center also prohibits photocopies and prevents inmates from possessing outgoing mail that is returned to sender.  Finally, Wishneski challenges the "dead mail" policy.  His complaint states that "any mail that is taken from us is placed in 'Dead mail'" and if an envelope contains anything other than addresses, it is placed in dead mail.  (Doc. 1 at F-5 to F-6.)

The Detention Center's mail policy, which is included in the County Defendants' *Martinez* report, requires all mail to be opened and searched for contraband, but prohibits staff from reading letters absent reliable information that there is a threat to the facility's security or that the letters are being used for an illegal activity.  Legal mail is to be opened and inspected in the inmate's presence. Legal mail is also recorded in a legal mail log book.  The policy prohibits photocopies that can be used as patterns for tattoos.  Envelopes containing any writing that is not part of an address may be

11

rejected.  As for dead mail, the policy simply states that it is logged in a special log book and turned over to the United States Postal Service.  (Doc. 219 Ex. 12.)

In his response to the *Martinez* report, Wishneski states that his legal mail has been opened out of his presence several times.  Although he claims that he has retained the mail as evidence, he has not provided this evidence with his response.  Wishneski further states that an Aramark employee read and took notes regarding his legal mail on two occasions.  Wishneski has provided an affidavit from an inmate "who ha[d] the same things happen to him" and he claims that he could provide another affidavit from a different inmate if he had access to the inmate.  (Doc. 230 at 90.) The affidavit describes several First Amendment deprivations suffered by the other inmate, including having his legal mail from the "M.I.M. Legal Department" and the National Lawyers Guild opened.  (*Id.* Ex. 3.)

*Turner* applies to regulations concerning incoming mail.  *See Turner*, 482 U.S. at 91; *Smith v. Maschner*, 899 F.2d 940, 943 (10th Cir. 1990).  Because "'[t]he implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials,'" a different standard applies to outgoing mail.  *Treff v. Galetka*, 74 F.3d 191, 194-95 (10th Cir. 1996) (quoting *Thornburgh*, 490 U.S. at 413).  "[L]imitations on a prisoner's First Amendment rights in his outgoing mail 'must further an important or substantial governmental interest unrelated to the suppression of expression [and] ... must be no greater than is necessary or essential to the protection of the particular governmental interest involved.'"  *Id.* at 195 (quoting *Procunier v. Martinez*, 416 U.S. 396, 413 (1974)).

Although Wishneski's complaint includes general attacks on the Detention Center's prohibition on photocopies and its treatment of outgoing mail, the complaint does not allege any specific instance in which Wishneski was denied a photocopy, that any particular outgoing mail of

12

his was returned to sender, or that any mail was taken from him because the envelope contained extraneous writing. In response to the *Martinez* report, Wishneski focuses only on the opening of his legal mail. In the absence of any allegation or evidence that Wishneski was affected by the other policies, I will address only Wishneski's claims regarding legal mail.

An inmate's legal mail may only be opened by prison officials in the inmate's presence. *Ramos v. Lamm*, 639 F.2d 559, 582 (10th Cir. 1980). But unless there is evidence of an improper motive or of interference with the right to counsel or to access the courts, isolated incidents of opening legal mail do not violate the Constitution. *Smith*, 899 F.2d at 944; *Berger v. White*, 12 F. App'x 768, 771 (10th Cir. 2001).

Here, the Detention Center's policy complies with the law by prohibiting the opening of legal mail outside the inmate's presence. Despite this policy, Wishneski claims that his legal mail was opened outside his presence several times and that an Aramark employee read and took notes regarding his legal mail on two occasions. There is no evidence of an improper motive or of interference with Wishneski's right to counsel or to access the courts. Accordingly, these isolated incidents are insufficient to establish a constitutional violation. Moreover, neither the County nor Aramark can be held vicariously liable for an employee's isolated failure to comply with the Detention Center's policy. *See Herrera*, 213 F. Supp. 2d at 1290 & n.2. I therefore recommend that summary judgment be granted in favor of Aramark and the County on Wishneski's claims regarding his legal mail.

## VISITATION CLAIMS

Wishneski claims that three attorneys who visited him at the Detention Center told him "to be careful" about what he said over the phone system in the attorney visitation booths "and not to say anything . . . incriminating." (Doc. 230 at 75.) He infers from this that the Detention Center

monitors conversations between inmates and counsel.  Wishneski asserts that he could produce affidavits from the attorneys, but would require a court order to do so.  It is not clear why he believes he would need a court order to obtain affidavits from his own attorneys when he did not need one to obtain affidavits from other inmates.

There is no evidence that the Detention Center monitors or records conversations between inmates and their attorneys.  Even if I accept the hearsay that three attorneys told Wishneski not to say anything incriminating, this would not establish that the conversations were monitored.  The attorneys may have simply been acting cautiously.

Wishneski also complains about the Detention Center's video-visitation policy.  Under this policy, inmates see their visitors over a television screen and speak with them through a telephone receiver.  Wishneski contends that this policy denied him meaningful visitation with his infant children.  The County Defendants' *Martinez* report includes a copy of the Detention Center's visitation rules.  These rules prohibit contact visits, but do not mention video visitation.  (*See* Doc. 219 Ex. 1.)  Nevertheless, the County admits that video visitation has been implemented in certain pods and that the County would like to implement it throughout the Detention Center.  The *Martinez* report contains an affidavit by Nancy Ontiveros, the Detention Center's records custodian.  According to Ontiveros, the Detention Center "has been moving toward implementing video visitation throughout the facility because it eliminates the need for inmates to be taken through the facility every time they have a visit."  (*Id.* Ex. 3 at 1.)  The affidavit does not explain how a records custodian came to know the reason for implementing video visitation, nor does it explain how eliminating the need to take inmates through the facility advances a legitimate penological objective.

The Tenth Circuit held in 1980 that prisoners do not have a constitutional right to contact visits.  *See Ramos*, 639 F.2d at 580 n.26.  Four years later, the Supreme Court considered whether

pretrial detainees have a constitutional right to contact visits with their spouses, relatives, children, and friends. *Block v. Rutherford*, 468 U.S. 576, 577-78 (1984). The Court stated, "That there is a valid, rational connection between a ban on contact visits and internal security of a detention facility is too obvious to warrant extended discussion." *Id.* at 586. But the Court held "only that the Constitution does not require that detainees be allowed contact visits when responsible, experienced administrators have determined, in their sound discretion, that such visits will jeopardize the security of the facility." *Id.* at 589; *see also Mann v. Reynolds*, 46 F.3d 1055, 1061, 1064 (10th Cir. 1995) (overturning restrictions on contact visits between inmates and attorneys because the government failed to provide any rationale for the policy).

Here, the Detention Center has gone a step further by not only prohibiting contact visits, but also limiting certain inmates, including Wishneski, to video visitation. The County has not offered any legitimate penological objective that is advanced by video visitation. The records custodian avers that video visitation eliminates the need to take inmates through the facility for visits. Perhaps this enhances security at the Detention Center, but the County does not say so. Moreover, the affidavit of the records custodian is not proper summary judgment evidence on this issue.

To support summary judgment, an affidavit "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." FED. R. CIV. P. 56(e)(1). "[O]nly statements 'made on personal knowledge' will support a motion for summary judgment; statements of mere belief must be disregarded." *Tavery v. United States*, 32 F.3d 1423, 1426 n.4 (10th Cir. 1994); *see also Told v. Tig Premier Ins. Co.*, 149 F. App'x 722, 725 (10th Cir. 2005) ("Information and belief have no place in an affidavit supporting a motion for summary judgment . . . .").

Ontiveros begins her affidavit by stating that "the following is true and correct to the best of my personal knowledge and belief . . . ."  (Doc. 219 Ex. 3.)  The Tenth Circuit has condemned similar language.  *See Fed. Deposit Ins. Corp. v. Oaklawn Apartments*, 959 F.2d 170, 175 (10th Cir. 1992).  The court disapproved of the language "to the best of [the affiant's] knowledge and belief." *Id.*  The only difference between that case and this one is the addition of the word "personal" in Ontiveros's affidavit.  The mere recitation that Ontiveros has personal knowledge is insufficient. In *Told*, the Tenth Circuit upheld a district court's order striking a verification that stated that the facts in a summary judgment motion were, "based upon my personal knowledge . . . true and correct to the best of my knowledge and information."  *Told*, 149 F. App'x at 725.  Ontiveros's personal knowledge could be inferred from the affidavit itself if her position indicated that she would have personal knowledge and competence to testify regarding the facts stated in the affidavit.  *See Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990); *see also Told*, 149 F. App'x at 725-26 (citing *Barthelemy*).  But there is nothing in the remainder of the affidavit to indicate that Ontiveros's position as records custodian would give her personal knowledge about why the Detention Center is implementing video visitation.  *See Mitchael v. Intracorp. Inc.*, 179 F.3d 847, 855 n.9 (10th Cir. 1999) (finding an affidavit that purported to establish the affiant's personal knowledge of an agreement "unpersuasive" because the affiant did not state how he learned of the agreement, how he could speak to what the parties to the agreement wanted or needed, or when the agreement was formed).

In short, Ontiveros's affidavit does not show that she has the personal knowledge or competence required to testify regarding the reason for video visitation.  Even if she did, the reason she offers—that it eliminates the need for inmates to be taken through the facility—leaves the Court to guess at the penological interest at stake.  *See Mann*, 46 F.3d at 1061, 1064.  The County also has

not explained why only certain pods have been switched to video visitation, while inmates in other pods presumably still enjoy face-to-face visits.  Because the *Turner* factors have not been adequately developed, Wishneski's claim regarding video visitation is not ripe for summary judgment.

### NOISE CLAIM

Wishneski claims that "noise levels" at the Detention Center are "totally unacceptable and create extreme stress disorders and psychological stress."  (Doc. 1 at F-18.)  In particular, he complains about the buzzer that is used to "sound for count" in pod D-2.  (*Id.* at F-19.)  He speculates that the buzzer exceeds safe decibel levels.  According to Wishneski, all of the buzzers cause "emotional distress" and "mental anguish" and the buzzer in pod D-2 is "loud to the point that it is physically harmful to the human ear, and that it literally hurts the ear."  (Doc. 230 at 84.)

The Prison Litigation Reform Act (PLRA) provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).  The only proof of physical injury submitted by Wishneski is his averment that the buzzer "is physically harmful to the human ear and that it literally hurts the ear."  Wishneski is not competent to testify regarding whether the buzzer is physically harmful to prisoners' ears.  *See Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir. 1994) (stating that a self-diagnosis is insufficient).  Liberally interpreting Wishneski's claim that the buzzer "literally hurts the ear" to mean that he personally experienced pain as a result of the loud buzzer, this one conclusory statement is insufficient to demonstrate that he suffered substantial pain.  *See Ruark v. Solano*, 928 F.2d 947, 949 (10th Cir. 1991) (holding that allegation that cell was small and noisy did "not rise to the serious level implicating a violation of constitutional rights"), *overruled on other grounds by Lewis v. Casey*, 518 U.S. 343 (1996); *cf. Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (indicating that

17

substantial pain is required to state a claim for deliberate indifference).  Lacking physical injury, Wishneski cannot recover for his claimed mental and emotional injuries.  I therefore recommend that summary judgment be granted in favor of the County on Wishneski's claim regarding the buzzers and noise at the Detention Center.

### EXCESSIVE FORCE CLAIM

Wishneski's complaint describes an incident on March 21, 2008, in which Sergeant Van Gils "came running in the cell with her stun gun drawn screaming for the 3 of us who were in the cell to get on the floor."  (Doc. 1 at F-13.)  Van Gils allegedly told Wishneski that she would shoot him if he did not get on the floor.  The complaint suggests that this incident was not unusual and states that the "overshow of force" keeps detainees in a "constant state of fear."  (*Id.*)  According to the records custodian, there is no record of the March 21, 2008 incident.  (Doc. 219 Ex. 3 at 1.)  Van Gils has submitted an affidavit stating that she has no recollection of the incident and that she was not assigned to Wishneski's pod on the date in question.  (Doc. 223 Ex. 27.)  In response to the *Martinez* report, Wishneski contends that the Detention Center should have documentation of the incident and that if he is given the opportunity to conduct discovery he will be able to prove that it happened.

Assuming that the incident did occur in the manner described in the complaint and that it amounts to excessive force, Wishneski has failed to submit any evidence as to how he was injured.  A significant injury is not required for an excessive force claim and a psychological injury may suffice generally.  *See Northington v. Jackson*, 973 F.2d 1518, 1524 (10th Cir. 1992); *see also Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007) ("[A] claim of excessive force requires some actual injury that is not de minimis, be it physical or emotional.").  However, as a result of the PLRA provision discussed above, Wishneski cannot recover for a psychological injury without a showing of some physical injury.  Wishneski has presented no evidence of a physical injury, and

even if he had presented evidence of a physical injury, he offers no indication that he suffered any emotional distress from Van Gils's threat to use a stun gun on him.  I recommend that summary judgment be granted in favor of Van Gils on the excessive force claim.

### ADMINISTRATIVE SEGREGATION CLAIMS

On September 10, 2008, Wishneski filed a document in which he stated that he was removed from his pod on August 26, 2008 as a result of a non-physical argument with another inmate in the pod.  (Doc. 50.)  The next day, as he and Officer Walters were discussing where he would be housed, Lieutenant Porter walked in and instructed Walters to place him in administrative segregation.  Wishneski claimed that he did not request protective custody, was not charged with a disciplinary infraction, and did not receive any type of hearing before being taken to administrative segregation.  On September 1, 2008, another officer advised Wishneski that, according to "the computer," he was being segregated "per Lt Porter."  (*Id.* at 3.)  Wishneski asked Porter on the following day if he could speak with him, and Porter responded, "I'm not talking to you[.] I'm going to continue to treat you cruelly, unfairly, and violate your civil rights."  (*Id.*)  This was said immediately after Porter confirmed with Walters that Wishneski had filed grievances "to that effect."  (*Id.*)  Based on this exchange, Wishneski concluded that he was segregated for retaliatory reasons.  Wishneski claims that an impartial witness overheard the exchange.

In a later document, Wishneski supplied some details regarding what it is like to be in administrative segregation.  (Doc. 75.)  Prisoners in the general population are allowed to attend religious services and rehabilitation programs, are allowed outdoor recreation three times a week, and can move through the facility without being shackled.  None of this is true for segregated prisoners.  They are confined in a six-by-twelve cell, which they only get to leave for one hour every other day.  They cannot interact with inmates in the general population.  Wishneski asserted that this

19

isolation caused him unidentified "psychological effects."  (*Id.* at 12.)  The Court treated these two documents as asserting supplemental claims for a denial of due process against Porter and the County and for retaliation against Porter.  (Doc. 81.)

It is undisputed that Wishneski was in administrative segregation for approximately two months.  The County Defendants argue that Wishneski's due process claim fails because he was only segregated for a short period of time.  Additionally, they contend in their *Martinez* report that he was segregated for his own safety.  The County Defendants have provided an affidavit by Porter, stating that Wishneski was transferred to administrative segregation because he got in an argument with several inmates and those inmates threatened to hurt him if he came back to the pod.  Porter denies retaliating against Wishneski and denies making the statements that Wishneski claims he made.  (Doc. 223 Ex. 28.)

In response, Wishneski claims that it is not standard procedure for an inmate to be segregated just because he is having a problem in his pod.  Instead, such inmates are usually transferred to another pod.  Wishneski has provided a declaration under penalty of perjury by an inmate who states that he heard Porter tell Wishneski, "'I'm not talking to you.  I'm going to continue to treat you cruelly, unfairly, and violate your civil rights.'" (Doc. 230 Ex. 5.)[5]

The Supreme Court has held that a protected liberty interest may arise from prison placement decisions and conditions of confinement, but such an interest is "generally limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation

---

[5] The County Defendants argue that the declaration should not be considered because it is not notarized and is in Wishneski's handwriting.  A declaration under penalty of perjury has the same force and effect as an affidavit.  *See* 28 U.S.C. § 1746.  Wishneski admits that he prepared the declaration because the other inmate cannot read or write very well.  (Doc. 240 at 11.)  The signature on the declaration does not appear to be in Wishneski's handwriting.  Accordingly, I will consider the declaration.

to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see also Estate of DiMarco v. Wyo. Dep't of Corr.*, 473 F.3d 1334, 1339-40 (10th Cir. 2007).[6]

To determine whether prison conditions constitute an atypical and significant hardship in relation to the ordinary incidents of prison life, the Tenth Circuit has held that a court must have sufficient evidence before it to address both the duration and the degree of the plaintiff's restrictions as compared with other inmates. *Trujillo v. Williams*, 465 F.3d 1210, 1225 (10th Cir. 2006). The court has suggested that a due process claim might be rejected solely because the prisoner spent a very short period in administrative segregation. *See Gaines v. Stenseng*, 292 F.3d 1222, 1226 (10th Cir. 2002) (stating that segregation for fewer than seventy-five days "could fail as a matter of law to satisfy the 'atypical and significant' requirement"). Notwithstanding this suggestion, the court subsequently set forth four factors that should be considered to determine whether a prisoner has a liberty interest in avoiding administrative segregation. *See DiMarco*, 473 F.3d at 1342. These factors are "whether (1) the segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) the conditions of placement are extreme; (3) the placement increases the duration of confinement . . .; and (4) the placement is indeterminate . . . ." *Id.* None of these factors is dispositive. *Id.*

Taking the last factors first, Wishneski's stay in segregation was not indeterminate—it lasted for approximately two months—and there is nothing to suggest that it increased the overall duration of his confinement. Turning to the second factor, the conditions described by Wishneski are not

---

[6] *Sandin* applies to convicted prisoners. Wishneski contends that he was a pretrial detainee when he was placed in administrative segregation because the New Mexico Court of Appeals later proposed to reverse his conviction. However, because Wishneski was convicted several months before he was placed in administrative segregation, he was not a pretrial detainee. *See Berry v. City of Muskogee*, 900 F.2d 1489, 1493 (10th Cir. 1990).

extreme in comparison to other conditions that have been rejected as atypical and significant. *See Jones v. Baker*, 155 F.3d 810, 812, 815 (6th Cir. 1998) (thirty-month segregation; no ability to interact freely with other inmates or opportunity for work assignments or educational and vocational programs; recreational, visitor, telephone, and radio privileges reduced; required to eat meals alone); *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) (six-month segregation; cell unsanitary and hot; permitted to leave cell only three or four times per week; no outside recreation and no educational or religious services available; smaller portions of food than in general population); *Griffin v. Vaughn*, 112 F.3d 703, 706-08 (3d Cir. 1997) (fifteen-month segregation; no access to radios, televisions, telephone calls (except emergency or legal), personal property, or commissary (except writing materials); exercise for one hour per day five days per week).  There is a dispute as to whether Wishneski's segregation was for a legitimate penological purpose, with Wishneski contending it was retaliatory and the County contending it was for his own safety.  Regardless of this dispute concerning the first factor, the other three factors point strongly towards the absence of a liberty interest.  Having considered these factors in conjunction with the relatively short duration of the segregation, I recommend that summary judgment be granted in favor of the County and Porter on Wishneski's due process claim.

However, even if Wishneski's segregation would otherwise be permissible, he can prevail on a § 1983 action against Porter if he can establish that Porter ordered him into segregation in retaliation for exercising his right to access the courts. *See Smith v. Maschner*, 899 F.2d 940, 947-48 (10th Cir. 1990); *see also Fogle v. Pierson*, 435 F.3d 1252, 1263-64 (10th Cir. 2006).  To prevail, Wishneski will have to prove that retaliation was the "but for" cause of the placement. *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998).  Wishneski has presented sufficient evidence on this issue to survive summary judgment.  He states under penalty of perjury that segregation is not the

Detention Center's usual way of handling his situation and that he could have been transferred to another general population pod instead.  Wishneski also swears that Porter told him he intended to violate his civil rights immediately after confirming with another officer that Wishneski had filed grievances.  Wishneski has provided a declaration under penalty of perjury from a witness who claims to have overheard Porter say this.  Although Porter has denied Wishneski's claim under oath, this simply creates a fact issue regarding the motive for Wishneski's segregation.

### FAILURE TO PROTECT CLAIM

Wishneski alleges that he was bullied by other prisoners because violent repeat offenders were housed with first-time non-violent offenders.  In his complaint, he claimed that he reported the situation three times, specifically advising officials that a prisoner was smacked for urinating in the wrong toilet.  (Doc. 1 at F-7 to F-8.)  Wishneski further alleges that on June 1, 2008, he was "attacked and blindsided by a federal inmate," causing him bruises, abrasions, and a broken nose. (Doc. 37 at 2.)  He claims that Officer Reyes and Lieutenant Mendoza were made aware of the potentially volatile situation before June 1, 2008.  He claims that Officer McDonald was responsible for housing him in the violent pod.  (Doc. 75 at 27-28.)

The County Defendants' *Martinez* report includes documentation supporting Wishneski's claims about the June 1, 2008 incident.  On that date, Wishneski was housed in pod D-4.  (Doc. 219 Ex. 18.)  Officers found him with an injury to his nose and red marks on his head.  (*Id.* Ex. 16, 17.) The *Martinez* report does not address whether Wishneski's nose was broken, but the County Defendants do not deny this allegation (which Wishneski made under penalty of perjury) and the records indicate that he was taken to a hospital on the date in question.  (*See id.* Ex. 18.)  The other prisoner involved was later found guilty of a disciplinary violation.  The disciplinary board found

"no evidence or report [that] Wishneski did anything to anyone." (*Id.* Ex. 17.)  On June 9, 2008, Wishneski was transferred to pod B-1.  (*Id.* Ex. 18.)

The *Martinez* report does not include affidavits from McDonald or Reyes.  Mendoza has provided an affidavit, but it demonstrates an utter misunderstanding of Wishneski's claim.  (*See id.* Ex. 19.)  The affidavit states that Mendoza approved all housing transfers at the Detention Center between June 2006 and April 2008 and that Wishneski was housed in pod B-1 from June 9 to August 26, 2008.  According to Mendoza, "Wishneski never complained to me or anyone else that he had safety concerns regarding his being housed in pod B-1." (*Id.* at 1.)  The affidavit does not attempt to explain how Mendoza knows that Wishneski made no complaints to anyone else.  More fundamentally, Wishneski is not complaining in this suit about being housed in pod B-1 after June 1, 2008; he is complaining about the Detention Center's failure to protect him from an attack that occurred on June 1 in pod D-4.  Mendoza does not deny that Wishneski complained about pod D-4 before June 1.

In his response to the *Martinez* report, Wishneski declares under penalty of perjury that he "put 3 request forms in to classification informing them of the threats being made and the violence taking place within the pod, even naming the individuals responsible." (Doc. 230 at 77.)  He put the forms in "the mailbox specifically addressed to classification." (*Id.* at 78.)  He did not put his name on the forms out of fear.  Wishneski also refers to the March 21, 2008 incident that prompted his excessive force claim.  Before Sergeant Van Gils came into his cell and ordered him onto the floor, three of the inmates in pod D-4 got a guard to open a door, ran out of the pod, and attacked another inmate.  Wishneski also claims that there were many gang members in the pod and that the person who attacked him had been transferred to the pod because he had gotten into a fight in another pod.  He argues that this information shows that Detention Center officials knew of the propensity for

24

violence in pod D-4. He avers that he can prove his failure to protect claim if he is given the opportunity to conduct further discovery. For example, he suggests that if the County produced a list of all the people housed in the pod who were gang members and all the incident reports for the pod, these documents would demonstrate that officials knew it was a dangerous place.

"To establish a cognizable Eighth Amendment claim for failure to protect an inmate from harm by other inmates, the plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm, the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component." *Smith v. Cummings*, 445 F.3d 1254, 1258 (10th Cir. 2006) (internal punctuation omitted).

Wishneski has presented sufficient summary judgment evidence regarding the objective component to survive summary judgment. He describes inmates' characteristics and previous incidents that, if true, raise a fact issue as to whether being housed in pod D-4 exposed him to a substantial risk of serious harm. And the harm that he in fact suffered, which included a broken nose, qualifies as serious.

The subjective component is satisfied when an "official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842. As an example, the Supreme Court has stated that if the plaintiff presents evidence "that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted

by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Id.* at 842-43 (internal quotation marks omitted).[7]

Wishneski does not claim that he complained directly to Mendoza, Reyes, or McDonald about the situation in pod D-4, but he says that he complained in writing three times by placing forms in "the mailbox specifically addressed to classification." Certainly, Wishneski bears the burden of presenting sufficient summary judgment evidence to raise a fact issue as to the three officials' knowledge. But there has been no formal discovery in this matter. The *Martinez* reports, which are in the complete control of the Defendants, are meant as a substitute for discovery. Disregarding Mendoza's incompetent and irrelevant affidavit, the County Defendants have not responded to Wishneski's claim that he reported his concerns to classification. For example, the *Martinez* report contains no information about the procedures inmates are supposed to follow to report safety concerns. At this point, it is unclear whether the method Wishneski claims he used was proper or whether the forms likely would have found their way to the three officials he blames. None of the officials have denied knowledge of a dangerous condition in pod D-4 or denied that they received Wishneski's complaints.

---

[7] Contrary to the argument advanced in the County Defendants' reply brief, the fact that Wishneski did not sign the forms is not dispositive. *See Farmer*, 511 U.S. at 833-34 ("If . . . prison officials were aware that inmate rape was so common and uncontrolled that some potential victims dared not sleep but instead would leave their beds and spend the night clinging to the bars nearest the guards' station, it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom." (internal punctuation and citations omitted)); *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) ("The official's knowledge of the risk need not be knowledge of a substantial risk to a *particular* inmate . . . .").

Moreover, Wishneski has presented some evidence (the March 21, 2008 incident, the transfer of his attacker, the presence of gang members) that the risk may have been obvious, and he has identified specific documents that he believes would support this inference. *See Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1310 (10th Cir. 2010). The *Martinez* report contains no documents regarding incidents or conditions in pod D-4, nor does it contain an affidavit attesting to the absence of documents or stating that there was no reason to suspect that the pod was dangerous.

If this matter were before the Court after both sides had an opportunity to conduct discovery, summary judgment might be appropriate based on the evidence currently before me. Given that Wishneksi has not been able to conduct discovery but has nevertheless presented some evidence on both components of the test and that the County Defendants' *Martinez* report is unhelpful, I recommend that summary judgment not be granted for either side on the failure to protect claim.

## MEDICAL CLAIMS

Wishneski's remaining claims relate to inadequate medical care he allegedly received while incarcerated at the Detention Center. The deliberate indifference standard applies to claims of inadequate medical care, whether the plaintiff is a pretrial detainee or a convicted prisoner. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002). As discussed above, deliberate indifference includes both an objective and a subjective component. The objective component is met if the deprivation is "sufficiently serious." *Id.* A medical condition is sufficiently serious if it has been diagnosed by a physician as mandating treatment or if it is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Id.* Pain may also be sufficiently serious to constitute a serious medical need. *See Sealock*, 218 F.3d at 1210. The subjective component is met if an official knows of and disregards an excessive risk to a prisoner's health or safety. *Olsen*, 312 F.3d at 1315.

***Dental Care***

In his complaint, Wishneski alleged that the Detention Center does not offer prophylactic dental care, such as check-ups and cleaning, and that the only treatment offered for a cavity is to have the tooth pulled.  (Doc. 1 at F-16 to F-17.)  He later filed a document stating that he had a dental visit at the Detention Center and the dentist found a cavity.  (Doc. 63 at 5.)  However, he was transferred to a state prison shortly after the dental visit and he did not state that he had the tooth pulled.  (Doc. 130 at 7-8.)  I recommended that Wishneski's dental claims be dismissed because he has no right to prophylactic care and because there was nothing to indicate that he was harmed by the extraction-only policy.  (*Id.* at 8.)  Wishneski objected to this recommendation, claiming that he "was left to suffer with a toothache for more than 6 months needing a filling" because he would not agree to have the tooth pulled and opted instead to wait until he was transferred to state prison, where the tooth was fixed "immediately upon [his] arrival."  (Doc. 152 at 4, 8.)  Based on Wishneski's belated allegation of six months' pain and suffering, the presiding judge allowed him to proceed with his claim regarding the extraction-only policy, but not with his claim regarding prophylactic care.  (Doc. 183 at 2.)

The County does not deny that it has an extraction-only policy, but it has not provided any description as to how that policy operates.  The *Martinez* report includes a policy regarding intake procedures for health screening to be followed upon an inmate's arrival at the Detention Center. This policy requires an inmate who has significant oral pain to be scheduled for the next available appointment and further requires an inmate who has an abscess and is in significant pain to be scheduled for an appointment within two days.  (Doc. 219 Ex. 4 at 3.)  Nothing is said about the treatment offered during the appointment.  Additionally, the report includes the Detention Center's "informed consent" policy, which requires an inmate's consent before a dental extraction.  (*Id.* Ex.

28

5.)  The *Martinez* report also refers to Ontiveros's affidavit, which states that "if an inmate has insurance or the ability to pay for dental care, the inmate can make arrangements for dental care they [sic] deem appropriate."  (*Id.* Ex. 3 at 2.)  The report does not include any policy to this effect.

In his response to the *Martinez* report, Wishneski continues to argue that he was entitled to prophylactic care.  Pursuant to the presiding judge's order, this issue is not properly before me.  Wishneski disputes that dental appointments are as timely as suggested by the report and he claims that he complained "of the need for dental care for six months prior to being seen by the dental department" and that he "was in pain with the tooth for more than 6 months and [he is] still having a problem with it."  (Doc. 230 at 80A, 82.)  According to Wishneski, the prison dentist has told him that although he would try to fix the tooth, Wishneski will most likely lose it.  This statement is hearsay and contradicts Wishneski's earlier statement that the tooth was fixed immediately upon his arrival at the state prison.  Finally, Wishneski states that he was unaware of any policy allowing him to seek outside treatment and that, in any event, it would be unrealistic to think that inmates could afford to pay for treatment or for insurance.

The only issue before me regarding dental care is whether the County's extraction-only policy violates the Constitution and if so, whether Wishneski was injured by it.  *See Stack v. McCotter*, 79 F. App'x 383, 386, 388 (10th Cir. 2003) (stating that an "extraction-only" policy arguably violates the Eighth Amendment).  The policies submitted by the County do not speak to Wishneski's claim regarding the extraction-only policy.  The intake procedures do not address whether the only treatment for a cavity is extraction of the tooth, nor do they deal with inmates who have already been admitted to the Detention Center.  Similarly, the informed consent policy is irrelevant because Wishneski is not claiming that an extraction was performed against his will.  The County has not provided a written policy allowing inmates to arrange for their own dental care, and

29

there is nothing to indicate that Ontiveros—the records custodian—has the requisite personal knowledge or competence to state that such a policy exists.  The County has not directed me to any evidence specifically regarding Wishneski's dental treatment—for example, whether he complained of pain and if so, whether he was given any treatment for the pain.

On the other hand, Wishneski seems to be attempting to change the nature of his claim. Wishneski's allegations in this suit have been amended in countless ways already, and he has been permitted to proceed with his dental claim based on a tardy allegation that he suffered pain as a result of the extraction-only policy.  He cannot now attempt to show that he will suffer a permanent injury as a result of the extraction-only policy, and even if that would be allowed, he has presented nothing more than hearsay to establish that he may lose the tooth.

Regarding the objective prong of deliberate indifference, Wishneski was not diagnosed with a cavity until he saw the dentist on September 25, 2008, at which point he was apparently given the options of having the tooth pulled or waiting to have a filling once he was transferred to the state prison.  Although substantial pain may constitute a serious medical need, "not every twinge of pain suffered as the result of delay in medical care is actionable." *Sealock*, 218 F.3d at 1210. Wishneski's only competent summary judgment proof regarding his pain is his own averment that he "was in pain with the tooth for more than 6 months."  He does not describe the severity or regularity of the pain or mention any restrictions caused by the pain, such as an inability to sleep or eat.  This one conclusory averment is insufficient to create a fact issue regarding the objective prong of deliberate indifference.

Regarding the subjective prong, there is nothing to indicate that Detention Center officials were aware that Wishneski was in pain.  The record contains only one medical request form in which Wishneski sought dental care.  On this form, dated August 31, 2008, Wishneski stated that

he thought he had a cavity.  (Doc. 217 Ex. A at 00163.)  There is no reference to pain.  Wishneski saw a dentist less than a month later.  Although he claims that the record is lacking many other requests for dental care, Wishneski does not claim that these requests informed Detention Center officials that he was in pain or that he thought he had a cavity.  Given the County's constitutionally permissible policy of not offering prophylactic care, the mere fact that Wishneski repeatedly requested a dental appointment does not demonstrate deliberate indifference.

I recommend that summary judgment be granted in the County's favor on Wishneski's dental claim.

### Phimosis (Defendants Jose Rosales and Pene Rene)

Wishneski alleges that he was not given adequate or timely medical treatment for phimosis, a medical condition affecting the foreskin of his penis.  He contends that he endured an eight-month wait for a circumcision because of Jose Rosales's intentional procrastination.[8]

Based on the medical records that have been submitted to the court, it appears that Wishneski first sought medical care for this problem in late September 2007.  (Doc. 217 Ex. A at 00210-11.)[9] A medical note dated September 28th indicates that an appointment for Wishneski to see a urologist would be made.  (Id. at 00210.)  A medical note dated October 9th states that he needed a urology

---

[8] There is a dispute as to whether Rosales is a medical doctor.  Apparently assuming that this Court is familiar with the arcane abbreviations of the medical world, Rosales's affidavit simply states, "I am a FNPDNP candidate in my residency."  (Doc. 223 Ex. 36.)  After his status as a medical doctor was challenged in Wishneski's response, the County Defendants replied—without any proof—that because Rosales's affidavit states that he is in his residency, this means "that he has completed medical school."  (Doc. 237 at 2.)  Considering the initials "NP" (suggesting that Rosales is a nurse practitioner), it appears that Wishneski has the better of this argument.  But determining his status is not necessary to resolve any of Wishneski's claims.

[9] The medical records are included in the *Martinez* report submitted by Defendants Gallardo, Smith, Rene, and Olona, which I will call the "GSRO *Martinez* report."

consult because his foreskin was swollen and difficult to retract, but there was no sign of infection. (*Id.* at 00154.)

There is no other mention of the problem until November 23, 2007, when Wishneski submitted a medical request form. (*Id.* at 00206.) Two days later, he submitted another request, stating that he had "been more than patient," and that he was experiencing pain and bleeding from what he believed was an infection. (*Id.* at 00205.) In a request submitted the next day, he stated that his foreskin "keeps bleeding." (*Id.* at 00204.)

On November 26th, Wishneski was seen by an outside provider–Dr. Gormley.  The authorization to transport Wishneski for this appointment was signed by "Jose Rosales, N.P." for the stated purpose of evaluating an "unretractable foreskin." (*Id.* at 00068.)  Gormley diagnosed Wishneski with phimosis and set forth a three-part plan of treatment: 1) apply topical antibiotics; 2) avoid retracting the foreskin; and 3) "Need [illegible] dorsal slit or Circumcision–can schedule per protocol as soon as possible." (*Id.* at 00069.)  The next day, a medical provider at the Detention Center saw Wishneski.  Although the provider's signature is illegible, Wishneski claims it was Rosales.  Rosales's treatment plan noted "consider circumcision." (*Id.* at 00151.)[10]

Wishneski has supplied a copy of Dr. Gormley's surgeon's worksheet, which shows that he was scheduled for a circumcision on January 15, 2008.  The worksheet has "cancelled" written across it. (Doc. 230 Ex. 1.)  That day, Wishneski submitted a medical request form, requesting to

---

[10] The County Defendants adopt a strained interpretation of the November 26th and 27th treatment plans. They assert that Gormley "recommended that Wishneski consider a possible circumcision." (Doc. 223 at 4.)  In fact, Gormley's treatment plan states that Wishneski needed either a dorsal slit or a circumcision "as soon as possible."  Regarding the November 27th notation, the County Defendants state, "It was also noted that Wishneski should consider a possible circumcision." (*Id.*)  Another at least equally plausible reading of this note is that the County should consider providing Wishneski with a circumcision.  In fact, a medical notation from the Detention Center dated November 29th states, "needs circumcision per Dr. Gormley." (Doc. 217 Ex. A at 00104.)  Wishneski claims this notation was made by Rosales.

"see someone immediately concerning the problem for which I was scheduled for surgery for today. THIS IS A SERIOUS PROBLEM."  (Doc. 217 Ex. A at 00200.)  Two days later, he submitted another request, again emphatically expressing his need to see a doctor.  (*Id.* at 00199.)  A January 20th medical request form states, "I was supposed to be scheduled for surgery a week ago and I'm having some severe bleeding and need something done as soon as possible."  (*Id.* at 00198.)  He put in another request the next day and apparently saw a medical provider on the 24th of January.  (*Id.* at 00197.)  After January 24th, there is a gap in the medical records regarding Wishneski's phimosis.

On March 13, 2008, Rosales signed a medical transport form, authorizing Wishneski to see Dr. Vann.  Under "nature of sickness or injury" was written "circumcision - due to infections."  (*Id.* at 00056.)  Under "diagnosis and treatment," Dr. Vann wrote, "needs circumcision."  (*Id.*)  Another form of the same date is difficult to read, but contains the terms "circumcision," "chronic phimosis episodes," "painful foreskin" and "InterQual approved."  (*Id.* at 00057.)  This form appears to have Rosales's signature as well as that of a medical doctor.  Following this form is an "InterQual" form, which appears to have been used to get authorization for the circumcision, though it is unsigned. (*Id.* at 00058-59.)

On April 29, 2008, Rosales again signed a medical transport form for Wishneski to see Dr. Vann regarding a circumcision.  (*Id.* at 00054.)  Dr. Vann wrote on the form that Wishneski would be scheduled for a circumcision on May 16, 2008 "once someone from your facility confirms it is ok."  (*Id.*)  On May 14, 2008, Rosales authorized Wishneski's transport to Dr. Vann for "pre-op" for the surgery scheduled on May 16, 2008.  (*Id.* at 00044-45.)  The surgery was not actually performed, however, until May 23, 2008.  (*Id.* at 00039.)  Wishneski developed an infection after the circumcision and had to be transported to the emergency room in early June.  (*Id.* at 00029-38.)

33

Rosales has submitted an affidavit, stating that he worked at the Detention Center from September 2007 until May 2008, Wishneski was one of his patients, he referred Wishneski to a urologist, the urologist "recommended that Wishneski get circumcised, and I then made arrangements to schedule that surgery." (Doc. 223 Ex. 36.)  The affidavit concludes with the statement, "At no time did I procrastinate in treating Wishneski for any of his medical conditions, nor was I ever deliberately indifferent to any of Wishneski's medical needs." (*Id.*)

In his response to the *Martinez* reports, Wishneski indicates that he began submitting medical request forms regarding his foreskin on September 2, 2007, but those forms have not been included in the *Martinez* reports.  He questions why it took over two months before his first appointment with a urologist.  Wishneski suggests that the January 15, 2008 surgery was cancelled because Dr. Gormley did not renew his contract to treat the Detention Center's patients.  He claims that Rosales knew that Dr. Gormley was not going to renew the contract, so Rosales also knew that Dr. Gormley would not be able to follow through with the surgery.  Wishneski further questions why his surgery was not immediately rescheduled after the cancellation.

Viewing the above evidence in the light most favorable to Wishneski, he complained about a swollen, painful, and bleeding foreskin that was difficult to retract in September 2007.  At least two months passed before Rosales authorized his transport to an outside urologist.  The urologist immediately recommended a circumcision, and Rosales noted the next day that a circumcision should be considered.  However, Wishneski was not scheduled for the operation until January 15, 2008.  That surgery was cancelled for reasons that do not appear in the medical records.  On March 13, 2008, Rosales, acknowledging that Wishneski needed a circumcision, sent Wishneski to see another outside urologist, who also noted that he needed a circumcision.  Yet the medical records do not show any efforts to reschedule the circumcision until April 29, 2008, when Rosales again

authorized Wishneski to see Dr. Vann.  Although he was sent for pre-operative testing on May 14th for a surgery scheduled on May 16, 2008, the circumcision was not actually performed until May 23, 2008.  Approximately eight months had passed since Wishneski first requested treatment, and almost six months had passed since a urologist first indicated that he needed a circumcision. Wishneski claims he suffered from pain, swelling, bleeding, and difficulty urinating throughout this entire period.

Although Rosales admits that Wishneski was his patient, and the records show that Rosales had some authority to approve Wishneski's surgery and appointments with urologists, he offers no explanation for the delay.  His blanket averment that he did not procrastinate and was not deliberately indifferent to Wishneski's medical needs is self-serving and includes a legal conclusion. As such, it is not proper summary judgment evidence.  *See Hall*, 935 F.2d at 1111 ("[C]onclusory and self-serving affidavits are not sufficient."); *Rutherford v. Med. Dep't of Dep't of Corr.*, 76 F. App'x 893, 899 (10th Cir. 2003) ("A single affidavit making a conclusory statement that 'Mr. Rutherford was always provided with appropriate medical treatment,' . . . unsupported by medical records, does not satisfy the summary judgment requirement . . . .").

Regarding the objective component of deliberate indifference, Wishneski's phimosis and need for a circumcision were diagnosed by a doctor as mandating treatment and it would be obvious even to a lay person that a bleeding, swollen foreskin that cannot be retracted deserves treatment. When a prisoner complains of a delay in treatment, the objective component can be satisfied by evidence that the delay caused substantial harm.  *Sealock*, 218 F.3d at 1210.  Pain may constitute substantial harm.  *See id.*  The medical request forms and Wishneski's own statements about the pain he endured while waiting for the circumcision are sufficient to create a fact issue regarding the objective component.

Regarding the subjective component, a prison medical professional who serves as a gatekeeper for other medical personnel capable of treating a condition may be held liable under the deliberate indifference standard if he delays or refuses to fulfill the gatekeeper role. *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). In this case, there is evidence that Rosales performed a gatekeeper role regarding the treatment of Wishneski's phimosis. But there is no evidence to explain any of the delays that occurred. *See Harris v. Coweta County*, 21 F.3d 388, 393-94 (11th Cir. 1994) ("The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay."); *see also Rutherford*, 76 F. App'x at 899 ("A year and one-half delay in obtaining surgical relief after diagnosis of nerve damage could be determined to be unreasonable and indicative of deliberate indifference."). Summary judgment therefore should not be granted on Wishneski's claim against Rosales.

As for Pene Rene, Wishneski alleges that she refused to call him "down to medical" to treat his post-operative infection. (Doc. 75 at 34.) As evidence that her refusal was the result of deliberate indifference, Wishneski claims that he once heard her tell Nurse Olona that "You Say It Best When You Say Nothing at All" was the perfect song for inmates.

Rene has submitted an affidavit, which states that she is a licensed practical nurse who worked at the Detention Center from February 28, 2008 to September 18, 2008. (Doc. 217 Ex. F.) She worked the evening shift from 6:00 p.m. to 6:00 a.m. According to Rene, she worked primarily in the booking department, where she evaluated new inmates. She generally did not see inmates in the infirmary or treat them for ongoing medical conditions. She claims, "It is outside the scope of practice for a licensed practical nurse to examine male genitalia complaints unless related to severe trauma and life-threatening blood loss is evident." (*Id.*) If Wishneski complained about the infection in his penis, he would have been referred to a physician's assistant or medical doctor.

36

Rene says that she does not remember any occasion in which she was personally informed that Wishneski was seeking medical attention for the infection.  Finally, Rene asserts that she did not work the evening shift on June 8, 2008.  (*Id.*)  This last assertion refers to a statement in one of the many miscellaneous documents that Wishneski has filed.  In that document, Wishneski stated that he would be able to prove through documentation and affidavits that he requested medical attention during Rene's shift on June 8, 2008.  (Doc. 215 at 3.)  Responding to Rene's affidavit, Wishneski merely states that if he was wrong about the date, then someone else should be added as a defendant.

There is no evidence that Rene refused to treat Wishneski's infection.  Rather, the only evidence is that treating Wishneski's condition would not have been one of her responsibilities.  I therefore recommend that summary judgment be granted in Rene's favor on this deliberate indifference claim.

### Discontinuation of Thorazine (Dr. Karp)

Wishneski alleges that one of the medical providers at the Detention Center prescribed Thorazine for his anxiety disorder.  On September 6, 2008, he met with Dr. Karp for the first time to see if Karp would increase his noon dosage of Valium.  Wishneski claims that as soon as he walked into the room, Karp stated that he was going to discontinue the Thorazine because the Detention Center was no longer treating anxiety.  Wishneski told him that the medicine had helped him feel mentally stable for the first time in thirty-five years.  Karp responded that Wishneski's medications were "unheard of in jails and prisons."  (Doc. 51 at 2.)  Karp also stated that Wishneski should have been required to sign a consent form before taking Thorazine because it has severe side effects.

Karp has submitted two affidavits.  In the first affidavit, he indicates that he remembers seeing Wishneski around August of 2008, but he does not remember what happened during the

appointment.  (Doc. 222.)  He states, however, that Thorazine is an anti-psychotic drug that is typically used to treat schizophrenia and bipolar disorder.  It has serious and long-term side effects. Because of these side effects, which he describes in some detail, Karp claims, "Thorazine is not a medication that I would ever prescribe, or continue after another physician has prescribed, to treat sleep disorders, simple insomnia, anxiety or nail-biting."  (*Id.*)  In his second affidavit, Karp helpfully annotates Wishneski's progress notes for September 6, 2008, which summarize Wishneski's appointment with Karp.  (Doc. 236 Ex. C.)  These notes, with Karp's explanations of the abbreviations and symbols they contain, show that Wishneski complained of insomnia, depression, and an inability to relax.  He said that Valium was the only thing that ever helped him. The notes describe Wishneski as "Demanding, wants more Valium.  Affect is angry, he is aggressive!"  (*Id.*)  Karp diagnosed him with adjustment reaction disorder, poly-substance abuse, and anti-social personality disorder.  Karp wrote the following plan for Wishneski: Discontinue Thorazine "as no indication of psychosis," "[increase] Celexa [an anti-depressant used to treat anxiety] . . . . Continue Valium . . . [for 90 days for anxiety]," but "Plan to eliminate Valium soon." (*Id.*)  The progress notes conclude by stating, "Pt [patient] repeatedly threatened me with 'lawsuit' and 'you can talk to my lawyer' while demanding increases in Valium doses."  (*Id.*)

In response to Karp's *Martinez* report, Wishneski maintains that Karp discontinued the Thorazine without examining him first and that Karp laughingly indicated that the medication would be discontinued simply because Wishneski was a prisoner.  Wishneski believes that this demonstrates deliberate indifference.  He denies being threatening or demanding.  He claims that after discontinuation of the Thorazine, he returned to biting his nails "to bleeding nubs" and experienced sleepless nights and a drastic increase in anxiety.  (Doc. 230 at 60.)

Karp has presented valid summary judgment proof that he does not consider Thorazine to be an appropriate medication for the afflictions that Wishneski reported. Wishneski even acknowledges that Karp believed Thorazine's side effects to be so severe that Wishneski should have been required to sign a form advising him of the side effects before taking it. Wishneski also acknowledges that Karp increased his dosage of Celexa. And although Karp planned to discontinue the Valium, he allowed it to continue for ninety days (which, as it turns out, expired after Wishneski was transferred to a state prison and a new medical regime). Thus, Karp did not leave Wishneski's psychological conditions, including his anxiety, untreated. Accordingly, regardless of whether he failed to examine Wishneski or laughed about his plight as a prisoner, Wishneski has not shown that Karp acted with a conscious disregard to his health or safety—the standard for the subjective component of deliberate indifference.[11] Karp has established his entitlement to summary judgment on Wishneski's only claim against him.

### Administration of Medications (Janet Olona)

Wishneski has hepatitis C. He alleges that Nurse Janet Olona administered Tylenol to him although this medicine is contraindicated for patients with hepatitis. He claims he received Vicodin (which contains Tylenol's active ingredient) and Tylenol on other occasions as well.

Olona is a registered nurse who worked at the Detention Center from April 21, 2008 to September 14, 2009. (Doc. 217 Ex. E.) She admits in her affidavit that she gave Wishneski Tylenol, along with other medications, for a cold on one occasion because she forgot that he has

---

[11] It is also questionable whether Wishneski has satisfied the objective component. Since Wishneski was transferred to a state prison shortly after his meeting with Karp, he was deprived of Thorazine as a result of Karp's order for no more than two months. Arguably, a two-month period of increased anxiety, nail biting, and insomnia are not sufficiently serious to satisfy the objective component.

hepatitis.  After he took the drugs, he asked if he had been given Tylenol and when Olona stated that

he had, he informed her that he has hepatitis.  Olona disclosed her error on Wishneski's progress

notes.  (*See id.* Ex. A at 00125.)  In his response, Wishneski correctly points out that his medical

records reveal a few additional times that medical personnel administered Tylenol to him.  (*See id.*

at 00257, 00291-92.)

Other than Wishneski's bare assertion of indifference, there is nothing to indicate that Olona

or anyone else acted with the level of recklessness required to establish a claim of deliberate

indifference.  Negligence, even gross negligence, does not equate with deliberate indifference.

*Berry*, 900 F.2d at 1495.  Furthermore, there is nothing to indicate that Wishneski was actually

injured by the Tylenol.  I therefore recommend that summary judgment be granted in Olona's favor

on this deliberate indifference claim.

### Denial of Care (Dot Smith)

Wishneski alleges that Dot Smith, the medical director at the Detention Center, instructed

the medical staff "not to provide nothing" for Wishneski.  (Doc. 63 at 3.)  Smith has submitted an

affidavit, stating that she was the Detention Center's health services administrator (HSA) from June

29, 2008 to October 31, 2008.  Although she is a registered nurse in Florida, she did not act as a

nurse in her capacity as HSA, nor did she personally treat Wishneski.  It was not within the scope

of her duties as HSA to approve or authorize medical care for any inmate.  She denies making the

statement Wishneski attributes to her.  (Doc. 217 Ex. C.)

In response to Smith's affidavit, Wishneski states that he can produce witnesses to establish

that Smith did make the statement to medical staff.  He also disputes Smith's description of her

duties and claims that she had the power to instruct the medical staff regarding the care he received.

If he could subpoena witnesses, Wishneski believes he could prove his allegations.

Smith did not start working at the Detention Center until after Wishneski's circumcision and post-operative infection. During the period that she worked there, Wishneski's main complaints regarding substandard care relate to a problem with his shoulder, which is discussed immediately below. Although Wishneski was certainly not satisfied with the care he received for this problem, the records show that he did receive care during this period. It thus appears that even if Smith told some members of the medical staff not to provide care to Wishneski, they did not follow her directive. Because Wishneski cannot establish a causal link between the statement and his care, summary judgment should be granted for Dot Smith.

### *Shoulder Problem (Remaining Defendants)*

Wishneski claims that Gallardo, Olona, Rene, and the remaining County Defendants were deliberately indifferent to the medical condition involving his shoulder. Wishneski began complaining about pain in his left shoulder in August 2007. (Doc. 29 Ex. C.) He had an x-ray on August 28th and underwent an MRI on September 26th. (Doc. 217 Ex. A at 00329, 00331.) On October 17, 2007, he was seen by Dr. Watson, an outside specialist. (Doc. 29 Ex. G.) According to Watson, the MRI showed bursitis and a possible labral tear, but no rotator cuff tear. (*Id.* Ex. G.) Watson gave him an injection and recommended strengthening exercises using a Thera-Band. Wishneski met for a second time with Watson a month later. Watson noted that Wishneski had been unable to do his exercises because there was "some problem with being able to use [the Thera-Band] in the prison." (*Id.* Ex. I.)

On January 2, 2008, Wishneski saw Watson again. Wishneski said that the pain had been so intense while doing the exercises that he could not move his arm at all. (*Id.* Ex. L.) Watson's impression was that Wishneski had bursitis and a possible SLAP lesion. (*Id.*) Watson ordered

41

another MRI to rule out the SLAP lesion.  The MRI ruled out the SLAP lesion and multiple other possible problems, leaving a diagnosis of bursitis and rotator cuff inflammation.  (*Id.* Ex. N.)

When Wishneski was re-evaluated by Watson on June 18, 2008, Watson found his motion to be improving and his pain levels diminishing.  Watson wanted him to continue with physical therapy.  (*Id.* Ex. Q.)

Wishneski claims that Watson instructed him to do physical therapy with the Thera-Band three times a day.  He contends that the Defendants interfered with his physical therapy in various ways.[12]  The medical records attached to the GSRO *Martinez* report show that Wishneski regularly did his physical therapy from late November to late December 2007 and from March to early July 2008, though not at the frequency advised by Watson.  (Doc. 217 Ex. A at 00299, 00301-07.)  On May 10, 2008, Wishneski gave a love letter to Nurse Olona while he was at the medical office for his physical therapy.  (Doc. 64 at 17.)  Lieutenant Devilbliss then ordered that a staff member take the Thera-Band to Wishneski's cell three times a day so that he could do the exercises there.  On May 24, 2008, Wishneski advised Olona that this was not happening, so officials again made arrangements for him to do the exercises at the medical office.  (*Id.*)  On July 10, 2008, the medical director discontinued the Thera-Band exercises and gave Wishneski a new set of exercises that he could do on his own in his cell.  (Doc. 64 at 16-17; Doc. 217 Ex. A at 00299.)  Wishneski asserts that after he was placed in administrative segregation, the medical department authorized him to have the Thera-Band in his segregated cell.  He attached the Thera-Band to the "chow port" door

---

[12] The Detention Center would not allow him to keep the Thera-Band in his cell, so he was required to complete his exercises in the medical office.  The Defendants assert that the Thera-Band constituted contraband under applicable Detention Center policies.  After looking at those policies, I agree with Wishneski that the Thera-Band does not appear to meet the definition of contraband.  (*See* Doc. 219 Ex. 22.)  In the end, however, it is irrelevant whether Wishneski was allowed to keep the Thera-Band in his cell; the issue is whether he received the physical therapy.

to do the physical therapy.  His medical records contain physician's orders and notes showing that this arrangement was approved in late October 2008.  (*See* Doc. 217 Ex. A at 74, 110.)

Wishneski points out that his medical records do not contain any documentation regarding his physical therapy for January or February 2008.[13]  In her affidavit, Olona states that "the orders regarding Plaintiff's physical therapy were changed over time, such that at different periods, the orders did not require Plaintiff to come to the medical unit and Plaintiff was provided with shoulder strengthening exercises that he could do in his cell."  (*Id.* Ex. E.)  She also states that she is "generally aware that over the course of several months, there may have been times when it was difficult to schedule Plaintiff's exercises in the medical unit due to security issues, because the Plaintiff was not available, or because of the medical needs of other inmates."  (*Id.*)

Wishneski alleges that Dr. Gallardo, the Detention Center's medical director, failed to ensure that he received his physical therapy.  Gallardo's affidavit states that he is a medical doctor licensed in New Mexico and was the Detention Center's medical director from August 7, 2008 to April 17, 2009.  He recalls seeing Wishneski on two or three occasions.  On one of those occasions, he instructed Wishneski on some exercises to help his shoulder condition.  Gallardo claims that he was not responsible for scheduling Wishneski's physical therapy sessions and that he did not take any action to limit the sessions.  (*Id.* Ex. D.)  Although Wishneski wishes to hold Gallardo accountable for his missed therapy sessions, Gallardo cannot be held vicariously liable for others' failures under § 1983.  *See Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1154-55 (10th Cir. 2006).  There is nothing to indicate that Gallardo controlled when staff members allowed Wishneski to do his physical therapy or that Gallardo was aware that Wishneski was not receiving the therapy during

---

[13] There is a notation after the December 27th physical therapy session to "D/C until seen by surgeon."  (Doc. 217 Ex. A at 00301.)

the short period that his tenure as medical director overlapped with Wishneski's incarceration at the Detention Center.

Wishneski faults Lieutenant Devilbliss for not following up to make sure that he was actually receiving the Thera-Band in his cell after Devilbliss prohibited him from going to the medical office to do his therapy.  Devilbliss prohibited Wishneski from going to the medical office because Wishneski gave Olona a love letter at the office.  There is nothing to indicate that it was then Devilbliss's responsibility to make sure that the Thera-Band was delivered to Wishneski's cell. Furthermore, it appears that Wishneski was only required to do the exercises in his cell for about two weeks.  During this time, Wishneski says that the Thera-Band was brought to his cell approximately four times.  When he complained about not receiving the Thera-Band, he was again allowed to do the exercises at the medical office.  Wishneski has not shown that anyone exhibited deliberate indifference to his shoulder conditions during this episode.

Wishneski claims that on October 15, 2008, Sergeant Gamez confiscated the Thera-Band from his administrative segregation cell while he was sleeping.  When he reported it missing to Officer De la Torre, she found it in a garbage can and returned it to him.  The next night, Sergeant Gamez woke him up and took the Thera-Band again.  Gamez admits that he took the Thera-Band on two occasions while Wishneski was in segregation.  (Doc. 223 Ex. 32.)  He claims he removed it because it was considered contraband.  The medical records reflect that the Thera-Band was returned to Wishneski.  (*See* Doc. 217 Ex. A at 00074, 00110-11.)  Wishneski has not shown that he suffered additional pain or permanent damage as a result of being deprived of the Thera-Band for a short period of time.

Wishneski alleges that Rene, Olona, and the remaining County Defendants failed to call him for his physical therapy on many occasions.  Rene states in her affidavit that she is "not aware of

any occasion where [she] had responsibility for calling Plaintiff to the medical unit for his shoulder strengthening exercises.  This would have been outside [her] regular duties."  (*Id.* Ex. F.)  Some of the officers have submitted virtually identical affidavits, all claiming that they took Wishneski to the medical office whenever medical personnel instructed them to do so.  (Doc. 223 Ex. 29, 30, 33, 34.)

As noted above, the medical records demonstrate that Wishneski did not receive his physical therapy at the frequency recommended by his outside doctor.  But there is nothing to indicate that this failure was caused by anything more than negligence or that the officers knew that Wishneski was supposed to do his exercises three times a day.  Moreover, Wishneski has not demonstrated that he experienced additional pain or permanent damage as a result of not being able to do his exercises at the rate prescribed by the doctor.  I therefore recommend that summary judgment be granted against Wishneski on all of his claims related to the shoulder problem and physical therapy.

### Conclusion

For the reasons stated above, I recommend that:

1) summary judgment be granted in favor of Aramark, Van Gils, Karp, Smith, Gallardo, Olona, Rene, Ramos, De la Torre, Hernandez, Romero, Giron, Gerber, Infante, Devilbliss, and Gamez, and that all claims against these Defendants be dismissed with prejudice;

2) summary judgment be granted in favor of Porter, except with regard to the claim of retaliation;

3) summary judgment be granted in favor of the County on Wishneski's claims regarding legal mail, violation of attorney-client privilege, noise, administrative segregation, and the dental extraction-only policy; and

45

4) summary judgment be granted against the County and in favor of Wishneski on his claim of denial of access to information and that he be awarded $1.00 in nominal damages.

If the Court adopts my recommendations, the following claims will remain pending:

1) the claim against the County regarding video visitation;

2) the claim against Porter for retaliation;

3) the claim against Reyes, Mendoza, and McDonald for failure to protect; and

4) the claim against Rosales for deliberate indifference related to Wishneski's phimosis.[14]

---

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636 (b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

---

_William P. Lynch_
_____
WILLIAM P. LYNCH
UNITED STATES MAGISTRATE JUDGE

---

[14] Wishneski criticizes the County Defendants for failing to address his claim against Ontiveros in their _Martinez_ report. Wishneski had alleged that she denied him access to his medical records. It was my understanding that this allegation related to his claim of denial of access to the courts, which has already been dismissed. In any event, Wishneski has not explained why he needed his medical records or how he was prejudiced by being denied access to them.

46