IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


JOHNATHAN WISHNESKI,

       Plaintiff,

vs.                                  No. CIV. 08-0348 MCA/WPL

DOÑA ANA COUNTY, et al.,

       Defendants.


**MEMORANDUM OPINION AND ORDER**

      This matter is before the Court upon Defendants' *Motion for Summary Judgment No. I: on the Basis of Qualified Immunity and Other Grounds* [Doc. 352]  The Court has considered the submissions of the parties, the record in this matter, and the applicable law, and is otherwise fully advised.

**I.**      **Summary Judgment Standards**

      Fed.  R. Civ. P. 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  As  our Court of Appeals has succinctly stated:

> A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is "genuine" if a rational jury could find in favor of the nonmoving party on the evidence presented.

*Adamson v. Multi Community Diversified Serv., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008)."The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment." *Breyers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998). "It is not [the court's] province at the summary judgment stage to weigh the evidence or to make credibility determinations." *Sanders v. Southwestern Bell Telephone, L.P.*, 544 F.3d 1101, 1105-06 (10th Cir. 2008).

A motion for summary judgment based on qualified immunity involves a two-pronged inquiry:  (1) whether the defendant violated a federal constitutional or statutory right and (2) whether the right in question was clearly established.  *Hinton v. City of Elwood, Kansas*, 997 F.2d 774, 779-80 (10th Cir. 1993). A court reviewing a qualified immunity claim may consider the two prongs of the qualified immunity analysis in the order that the court in its sound discretion deems most appropriate. *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009)

## II.     Background

Plaintiff, Johnathan D. Wishneski, was booked into the Doña Ana County Detention Center in April 2007. [Doc. 29-1] He was initially held on pending charges.  A jury convicted him on at least one charge in February 2008. [Doc. 55 at 15]  Plaintiff was transferred to another facility in late October  2008. [Doc. 77; Doc. 352-1 at 2]  Plaintiff has three remaining claims: (1) a claim against Defendant Lt. Justin Porter alleging that Lt. Porter retaliated against Plaintiff for filing lawsuits against the DACDC, (2) a claim against Defendants Officer Malaquias Reyes, Officer Jeremy McDonald,  and  Lt. Benjamin Mendoza for failing to protect Plaintiff from an attack by another inmate, and (3) a claim against Defendant Jose Rosales for deliberate indifference to Plaintiff's medical needs.

### III.    Discussion

### A.    Retaliation for Exercise of Constitutional Rights

Plaintiff filed the present lawsuit on March 28, 2008. [Doc.1] His complaint incorporated the allegations of a petition for habeas corpus that he previously had filed in state court in February 2008.  There he asserted claims against the DACDC itself, and various DACDC officers and employees, including members of the medical staff; and Aramark Services, Inc., and various Aramark employees.  In the complaint and the incorporated  habeas petition, Plaintiff challenged a wide range of conditions of his confinement.  Lt. Porter was not named as a defendant in the March 28, 2008 complaint.

Plaintiff claims that he heard  nurse Janet Olona tell Lt. Porter that Plaintiff had filed a lawsuit against DACDC.  [Doc. 352-1 at 1]  Plaintiff recalled that this conversation occurred "in the beginning of 2008." [*Id.*] Ms. Olona testified that she began working at DACDC in April 2008. [Doc. 352-2] She denies telling Lt. Porter that Plaintiff had filed a lawsuit against DACDC. [Doc. 352-2].

On August 26, 2008, corrections officers heard Plaintiff arguing with another inmate. [Doc. 352-1 at 1]  The other inmate believed that Plaintiff was responsible for having another inmate moved out of the unit. [Doc.  352-1 at 1] The officers feared that Plaintiff might be the target of revenge by other inmates. [*Id.*; Doc. 352-3]  Plaintiff was removed from the general population and placed in booking overnight. [Doc. 352-1 at 1] The next day, as Plaintiff and Classification Officer Walters were discussing placing Plaintiff back in the general population, Lt. Porter ordered Officer Walters to place Plaintiff in administrative segregation. [Doc. 352-1 at 1] Plaintiff was held in administrative segregation from August 28, 2008 until late October  2008, when he was transferred to another corrections facility. [Doc. 352-1 at 2] According to Lt. Porter,

3

he had been informed by two corrections officers on August 26, 2008 that certain inmates were

"going to get" Plaintiff, and Plaintiff was moved out of the general population for his own safety.

[Doc. 352-3] According to Plaintiff, Lt. Porter held him in administrative segregation in

retaliation for Plaintiff's asserting his constitutional rights:

> On Tuesday September 2, [2008] I was being transported back from court through the Booking area of the facility when I saw Lieutenant Porter and asked if I could speak with him.  He stated and I quote "I'm not talking to you I'm going to continue to treat you cruelly, unfairly, and violate your civil rights." He said this to me right after confirming with officer Walters [that] I was in fact the inmate that had filed grievances to that effect.

[Doc. 50 at 3, ¶ 4].

> Under the law of our Circuit:

> It is well settled that "prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his constitutional rights."  But "an inmate is not inoculated from the normal conditions of confinement . . .  merely because he has engaged in protected activity."  Thus, to prevail on a claim for retaliation, a prisoner must show that, but for the retaliatory motive, the adverse action would not have taken place.  "An inmate claiming retaliation must allege *specific facts* showing retaliation because of the exercise of the prisoner's constitutional rights."

*Schmitt v. Rice*, 2011 WL 1571301 (10th Cir. April 27, 2011) (quoting *Peterson v. Shanks*, 149

F.3d 1140, 1144 (10th Cir. 1998)). "Government retaliation against a plaintiff for exercising his

First Amendment rights may be shown by proving the following elements:  (1) that the plaintiff

was engaged in constitutionally protected activity; (2) that the defendant's actions caused the

plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to

engage in that activity; and (3) that the defendant's adverse action was substantially motivated as

a response to the plaintiff's exercise of constitutionally  protected conduct." *Shero v. City of*

*Grove, Oklahoma*, 510 F.3d 1196 (10th Cir. 2007) (citing *Sorrell v. Henry*, 219 F.3d 1197 (10th

cir. 2000)).

The Court finds that Plaintiff has come forward with evidence that would permit a reasonable jury to conclude that Plaintiff engaged in protected activity by filing this lawsuit and the state court habeas petition. *Smith v. Maschner*, 899 F.2d 940, 947 (10th Cir. 1990) ("Prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his right of access to the courts."). Further, a jury that believes Plaintiff could find that Lt. Porter was aware of Plaintiff's lawsuit as early as April 2008.  Removal from the general population and transfer to administrative segregation can be viewed as a retaliatory adverse action.  *Dodge v. Ahlen*, Nos. 08-CV-00738-CBS-KLS, 08-cv-02436-CBS, 2011 WL 782491 *10 (D. Colo. March 1, 2011); *see also  Purkey v. Green*,  28 Fed Appx. 736, 745-46 (10th Cir. 2001) ("Because a prisoner must first file a grievance in order to ultimately gain access to courts to state a claim for relief under 42 U.S.C. § 1997e, then punishing him for actually filing grievances by placing him in disciplinary segregation would state a claim for a [sic] both an access to courts and a First Amendment violation.").  Most obviously, a principal disadvantage of administrative segregation was the confinement of Plaintiff to his cell for most of the day. [Doc. 370-1 at 33] The Court finds that there is a genuine issue of material fact as to whether confinement  in administrative segregation was sufficiently disadvantageous as to satisfy the adverse action requirement of Plaintiff's retaliation claim. Ultimately, Plaintiff's retaliation claim turns on the issue of causation, and Defendants have come forward with evidence of  legitimate safety concerns that would have justified removing Plaintiff to protective custody. The Court nevertheless finds that there exists a genuine issue of material fact as to Lt. Porter's actual motive for keeping Plaintiff in administrative segregation.  "[I]t is well established that an act in retaliation for the exercise of a constitutionally protected right is actionable under [42 U.S.C.] Section 1983 even if the act, when taken for a different reason, would have been proper."  *Smith*, 899 F.2d at 948 (quoting *Buise v.*

5

*Hudkins*, 584 F.2d 223, 229 (7th Cir. 1978); internal quotation marks omitted).   According to

Plaintiff, Lt. Porter confirmed that Plaintiff had filed grievances asserting constitutional rights

immediately prior to declaring that  "I'm going to continue to treat you cruelly, unfairly, and

violate your civil rights."  Lt. Porter's statements, as recounted by Plaintiff, can be understood as

mocking Plaintiff for the assertion of his constitutional rights in his grievances and his lawsuits.

Motive in retaliation cases is a question of fact.  *Abdulhaseeb v. Saffle*,  65 Fed. Appx. 667 (10th

Cir. 2003).  The Court may not make credibility determinations in resolving a motion for

summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A jury that

believes Plaintiff's testimony could find that  Lt. Porter made statements demonstrating his

antipathy to Plaintiff's assertion of his constitutional rights. This Court therefore concludes that

the record, when construed in the light most favorable to Plaintiff, creates a genuine issue of

material fact as to whether Lt. Porter was motivated by hostility to Plaintiff's assertion of his

constitutional rights.

Proceeding to the second prong of  the qualified immunity analysis, the Court finds that

Plaintiff's right to be protected against retaliation for the assertion of his constitutional rights was

clearly established.

> Whether a legal rule was clearly established at the time official action was
> undertaken "depends substantially upon the level of generality at which the
> relevant 'legal rule' is to be defined."  The Supreme Court has rejected an overly
> abstract approach to this issue, which would "destroy the balance that our cases
> strike between the interests in vindication of citizens' constitutional rights and in
> public officials' effective performance of their duties."  Instead, it has adopted a
> more particularized approach to whether a right has been "clearly established,"
> requiring that "[t]he contours of the right must be sufficiently clear that a
> reasonable official would understand that what his is doing violated that right."
>
> "This is not to say that an official action is protected . . . unless the very
> action in question has previously been held unlawful, but it is to say that in the
> light of pre-existing law the unlawfulness must be apparent."  "Ordinarily, in order

> for the law to be clearly established, there must be a Supreme Court or Tenth
> Circuit decision on point, or the clearly established weight of authority from other
> courts must have found the law to be as the plaintiff maintains."

*Walker v. City of Orem*,  451 F.3d 1139, 1151 (10th Cir. 2006) (citations omitted).

In *Smith v. Maschner*, 899 F.2d 940 (10th Cir. 1990), a case cited by Defendants [Doc. 352 at 15], our Circuit clearly held that retaliation against an inmate for exercising his right of access to the courts is unlawful.  *Id.* at 947-48.  The Court of Appeals observed that "[t]his principle applies even where the action taken in retaliation would be otherwise permissible." *Id.* at 948. In *Smith*, the plaintiff alleged, *inter alia*, "that defendants placed him in disciplinary segregation in retaliation for his ongoing litigation against prison officials and his 'jailhouse lawyering.'" *Id.* at 942.   Our Circuit reversed the district court's grant of  summary judgment on the plaintiff's retaliation claim, holding that "[plaintiff's] evidence is sufficient to support an inference by a fair-minded jury that defendants took disciplinary action against him based at least in part on improper motives."  *Id.* at 949.   In the present case, Plaintiff's evidence is even more compelling than the circumstantial evidence in *Smith*, as Plaintiff has testified to statements made by Porter that directly evidence Porter's hostility toward Plaintiff's assertion of his constitutional rights.

In *Pukey v. Green*, 28 Fed. Appx. 736 (10th Cir. 2001), the Court of Appeals cited *Smith* as support for the principle that placing an inmate in disciplinary segregation  in retaliation for having filed grievances is "both an access to courts and a First Amendment violation." *Id.* at 745-46.  *Pukey*  suggests that by 2001, our Circuit considered it settled that it was unlawful to place an inmate in disciplinary segregation in retaliation for the inmate's exercise of his right of access to the courts. *See Roska v. Sneddon,* 366 Fed. Appx. 930, 937 n.4 (10th Cir. 2010) (observing that unpublished cases may be relevant to the clearly-established prong of qualified immunity analysis

to the extent such cases demonstrate that cited principles are "uncontroversial and establish no new precedent").

In *Fogle v. Pierson*, 435 F.3d 1252 (10th Cir. 2006), our Circuit held that allegations that an inmate had been transferred into long-term administrative segregation in response to his "complaints" (which the Court of Appeals construed as possibly referring to administrative grievances) about prior placements in administrative segregation stated a claim for relief.

Plaintiff has satisfied his burden under both prongs of the qualified immunity analysis with respect to his claim against Lt. Porter. Summary judgment will be denied as to this claim.

### B.  Failure to Protect

Plaintiff was attacked by another inmate, Michael Thompson, on June 1, 2008. At the time Plaintiff and Thompson were housed in Unit D-4. According to an incident report, Plaintiff and Thompson "had a little verbal confrontation" and were told to return to their cells so that they could "cool off." [Doc. 370 at 35] The attack appears to have occurred shortly after this initial confrontation. Plaintiff testified that as he was leaning over a sink, "[Thompson] came up behind me and bashed m[y] head down into the sink and I didn't see it coming. I broke my nose and he bloodied me up and I couldn't see after that because it made my eyes tear and he started wailing on me pretty good and that was about it." [Doc. 352-1 at 9]

The Eighth Amendment imposes on prison officials a duty to protect prisoners from violence at the hands of other prisoners. *Howard v. Wade*, 534 F.3d 1227, 1236 (10th Cir. 2008). To establish liability under the Eighth Amendment, an inmate first must show that the conditions of his incarceration presented an "objective 'substantial risk of serious harm.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Second, an inmate must show that prison officials had subjective knowledge of the risk of harm and nevertheless disregarded that risk under

8

circumstances amounting to recklessness as defined in the criminal law. *Id.* 839-40.

According to Plaintiff, "D pod was notorious for housing a lot of gang affiliated people." [Doc. 352-1 at 4].  On one occasion gang members "smacked around" a new inmate who "urinat[ed] in the wrong toilet." [Doc. 352-1 at 9]  On another occasion in March 2008, three gang members "beat the shit out of" an inmate.  On yet another occasion, an older inmate was "rolled. . . out of the pod." [Doc. 352-1 at 8].  A young inmate was threatened by gang members. [Doc. 352-1 at 8]  Gang members fought in the showers "on a regular basis." [Doc. 352-1]

With respect to the objective component, inmate-on-inmate  violence clearly is a "serious harm" *Imani v. Bentley*,  2006 WL 1722429 *6 (E.D. Wis. 2006) ("A beating suffered at the hands of a fellow inmate 'clearly constitutes serious harm.'") (quoting *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005)).  But the objective component also incorporates the concept of risk–*i.e.* the likelihood that such serious harm will occur. *See Brown*, 398 F.3d at  910 (observing that the objective component of *Farmer's* two-prong test  includes a requirement that "that there was a substantial risk beforehand that the serious harm might actually occur");  *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (the risk of injury should be such that there is "'a strong likelihood, rather than a mere possibility'" of serious injury (quoting *Edwards v. Gilbert*, 867 F.2d 1271, 1276 (11th Cir. 1989)).  It is a closer question as to whether Plaintiff's evidence is sufficient to create a triable issue as to "the substantial risk" requirement of the objective component.  "[A] pervasive risk of harm may not ordinarily be shown by pointing to a  single incident or isolated incidents . . ." *Day v. Federal Bureau of Prisons*,  233 Fed. Appx. 132, 134 (3d Cir. 2007).  Evidence of "a small number of isolated incidents of inmate-on-inmate violence" is insufficient to establish a genuine issue of material fact as to a substantial risk of serious harm." *Hester v.*

*Morgan*, 52 Fed. Appx. 220, 223 (6th Cir. 2002); *see also Adames v. Perez*, 331 F.3d 508, 512-13 (5th Cir. 2003).  Here, Plaintiff's proffered evidence of isolated incidents of inmate-on-inmate violence is supplemented with testimony that  fights occurred in the showers "on a regular basis." The Court will assume for purposes of analysis that Plaintiff has come forward with evidence that would create a triable issue on the objective component of his Eighth Amendment claim.

Plaintiff's Eighth Amendment claim founders on the second, subjective component.

> The standard of culpability necessary to an Eighth Amendment violation is one of deliberate indifference.  "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety. . . . "  The standard is subjective, requiring that the official actually be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); citations omitted)).

Plaintiff was transferred  from Unit B-4 to Unit D-4 in January 2008. [Doc. 352-1 at 4] As the Court understands Plaintiff's claim against Officer McDonald,  Plaintiff claims that Officer McDonald instigated Plaintiff's transfer to Unit D-4. [Doc. 75 at 27-28; Doc. 352-1 at 4] There is no evidence proffered, however, about what  Officer McDonald, who appears to have been assigned to Unit B-4, knew about conditions in Unit D-4 at the time Plaintiff was transferred. At his deposition, Plaintiff conceded that there were only three or four specific instances of inmate-on-inmate violence that prison officials would have known about.  [Doc. 352-1 at 9]  Since the specific incidents of inmate-on-inmate violence described by Plaintiff occurred *after* Plaintiff was transferred to Unit D-4, they could not have been known to Officer McDonald at the time of Plaintiff's transfer to Unit D-4.  On the record before the Court, no reasonable jury could find that

Officer McDonald was aware of facts from which he could have drawn the inference that Plaintiff's transfer to Unit D-4 presented a substantial risk of serious harm to Plaintiff.

As the Court understands Plaintiff's claim against Officer Reyes, Plaintiff claims that Officer Reyes shares responsibility for Plaintiff's transfer to Unit D-4 [Doc. 352-1 at 4] and that following Plaintiff's transfer Officer Reyes ignored Plaintiff's complaints of gang-related violence in Unit D-4, Plaintiff's fear of being attacked,  and Plaintiff's request to be transferred out of Unit D-4. [Doc. 352-1 at 6]  Plaintiff concedes that there were only three or four specific instances of inmate-on-inmate violence that prison officials would have known about.  [Doc. 352-1 at ]  The specific incidents of inmate-on-inmate violence described by Plaintiff occurred *after* Plaintiff was transferred  to Unit D-4, and therefore could not have been known to Officer Reyes at the time of Plaintiff's transfer to Unit D-4.  Plaintiff has not  referred to the Court to deposition excerpts, written responses to discovery, or other evidence of what Officer Reyes actually knew about conditions in Unit D-4.  The Court finds that with respect to Officer Reyes' role in Plaintiff's transfer to Unit D-4 Plaintiff has failed to come forward with evidence that at the time of Plaintiff's transfer Officer Reyes was actually aware of a substantial risk of serious harm to inmates transferred to Unit D-4. Further, there is no evidence as to Officer Reyes' duties and authority and there is no evidence of how Officer Reyes responded to the information provided by Plaintiff.  It does not follow from the fact that Plaintiff was not transferred out of Unit-4 that Officer Reyes ignored Plaintiff's complaints, nor does it follow from the fact that Plaintiff was attacked by Thompson, an inmate with no apparent gang affiliation, that Officer Reyes ignored Plaintiff's complaints about gang-related violence in Unit-4. Plaintiff has failed to come forward with evidence that subsequent to Plaintiff's transfer to Unit D-4  Officer Reyes subjectively knew

of, and disregarded, a substantial risk of serous harm to inmates of Unit D-4 generally, or to Plaintiff specifically.

As the Court understands Plaintiff's claim against Lt. Mendoza,  Plaintiff claims that Lt. Mendoza shares responsibility for placing Plaintiff Unit D-4 [Doc. 352-1 at 5-6], and that Lt. Mendoza ignored three anonymous kites and a request for a transfer that Plaintiff submitted to the DACDC classification unit. There is no evidence proffered of what Lt. Mendoza actually knew about conditions in Unit D-4 at the time Plaintiff was transferred to Unit D-4.  As previously noted, Plaintiff concedes that there were only three or four specific instances of inmate-on-inmate violence that prison officials would have  known about.  [Doc. 352-1 at ]  The specific incidents of inmate-on-inmate violence described by Plaintiff occurred *after* Plaintiff was transferred  to Unit D-4, and therefore could not have been known to Lt. Mendoza at the time of Plaintiff's transfer to Unit D-4. The Court concludes that Plaintiff has not established  genuine issues of material fact as to Lt. Mendoza's actual knowledge that conditions in Unit D-4 presented a substantial risk of serious harm to transferees such as Plaintiff or that Lt. Mendoza  transferred Plaintiff to Unit D-4 in disregard of a substantial risk serious harm to Plaintiff.  Further, there is no evidence that Lt. Mendoza actually was aware of the isolated incidents of inmate-on-inmate violence described by Plaintiff that occurred after Plaintiff's transfer to Unit D-4.  Plaintiff concedes that he had no person-to-person contact with Lt. Mendoza during May through June 2008.  [Doc. 352-1 at 6]  There is no evidence that Lt. Mendoza actually saw the kites or the request for transfer that Plaintiff testified he submitted to the classification unit.  There is no evidence that Officer Reyes reported Plaintiff's complaints to Lt. Mendoza.  There is no evidence describing Lt. Mendoza's duties or authority or how the classification unit functioned generally. In the absence of evidence of Lt. Mendoza's duties, or how the classification unit functioned,

12

there is no basis for inferring that Lt. Mendoza would have seen the kites or request for transfer in the normal course of his duties.  In short, no reasonable jury could conclude on the record before the Court that Lt. Mendoza subjectively knew of, and disregarded, a substantial risk of serous harm to inmates of Unit D-4 generally, or to Plaintiff specifically.

As an alternative to showing that Defendants disregarded a general risk of serious harm to inmates housed in Unit D-4,  Plaintiff may show that DACDC officials disregarded the specific risk presented by Thompson.  *Street v. Corrections Corp. of America*, 102 F.3d 810, 815 n.12 (6th Cir. 1996); *see Bugge v. Roberts*, 2011 WL 1885537 *4 (11th Cir. 2011).  Again, Plaintiff's evidence falls short.   Plaintiff recalls that Thompson appeared to have been in a fight when he arrived in Unit D-4:  he was in "pretty bad shape" when he arrived, "all bruised up, had a black eye."  However, DACDC records reveal that Thompson was found to have been the victim, rather than the perpetrator, of an inmate-on-inmate assault.   [Doc. 370 at 14].  Thompson's records indicate that he was the subject of a number of disciplinary reports prior to June 1, 2008.  But with the exception of an April 20, 2008 incident in which a corrections officer reported that Thompson, "started 'yelling and screaming at me that he will fuck me up and who do I think I am'" [Doc. 370 at 18], none of Thompson's pre-June 1, 2008 disciplinary violations provide objective grounds suggesting he posed a risk of physical harm to anyone. There is no evidence that Thompson threatened or harmed another inmate prior to June 1, 2008.  Plaintiff has not come forward with evidence that would allow a reasonable jury to find that, prior to the June 1, 2008 attack, Thompson presented a substantial risk of serious harm to other inmates.

Further, in the absence of evidence that Thompson's prior behavior indicated that he posed a substantial risk of serious harm to other inmates, no reasonable jury could find that any

Defendant subjectively knew of, and disregarded, a substantial risk of serous harm presented by Thompson.

### C.    Deliberate Indifference to Plaintiff's Medical Needs.

The Eighth Amendment is violated by prison officials' deliberate indifference to an inmate's serious medical need.  *Mata v. Saiz*,  427 F.3d 745, 751 (10th Cir. 2005).  Claims by pretrial detainees are governed by  the same standard. *Frohmader v. Wayne*, 958 F.2d 1024,1028. (10th Cir. 1992).[1]

There is no dispute that Plaintiff suffered from a condition known as phimosis.[2]  As the Court understands Plaintiff's claim, Plaintiff is not claiming that Rosales completely ignored his phimosis–indeed, there is no dispute that  Rosales prescribed treatment for Plaintiff's phimosis; rather, Plaintiff is claiming that upon a diagnosis of phimosis, he was entitled to an immediate circumcision and that the non-surgical treatment provided by Rosales merely delayed his receipt of the appropriate medical treatment.

"The test for constitutional liability of prison officials 'involves both an both an objective and a  subjective component." *Id.*  (quoting *Sealock v. Colorado,* 218 F.3d 1205, 1209 (10th Cir. 2000)). An inmate-plaintiff must first satisfy an objective test, demonstrating that the deprivation of medical care was "sufficiently serious." *Id.*  (quoting *Farmer v. Brennan*,  511 U.S. 825 (1994)).

---

[1] Plaintiff was a pretrial detainee up to the point in time that he was convicted. *Berry v. Muskogee, Oklahoma*,  900 F.2d 1489, 1493 (10th Cir. 1990) (observing that "[t]he critical juncture is conviction").

[2] "[C]onstriction of the orifice of the prepuce (foreskin) so as to prevent the foreskin from being drawn back." *Lancaster v. Clark*, 2008 WL 4282588 *3 (W.D. Wash. 2008).

14

"[A] delay in medical care 'only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm'" such as "' lifelong handicap, permanent loss, or considerable pain.'"  *Mata*, 427 F.3d at 751 (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir.2001) and *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)).  Here, there is no evidence that Plaintiff experienced a lifelong handicap or permanent loss as the result of the treatment provided by Rosales.  Therefore, Plaintiff's Eighth Amendment claim must depend on evidence that the course of treatment provided by Rosales subjected Plaintiff to "considerable pain."  The degree of discomfort and pain experienced by Plaintiff is not entirely clear. In a request for treatment dated November 11, 2007 Plaintiff refers to his condition as "very painful." [Doc. 356-1]  In his treatment notes, Dr. Gormley notes pain in Plaintiff's penis. [Doc. 356-1 at 19] During his deposition, Dr. Gormley testified that Plaintiff likely would have been uncomfortable, [Doc. 364-1 at 25], and that it was reasonable to assume that Plaintiff would have experienced some "manipulating pain," [Doc. 364-1 at 12].  Dr. Vann testified that Plaintiff would have experienced "moderate pain, not severe." [Doc. 364-1 at 24] During his cross-examination of Dr. Vann, Plaintiff represented that "I'm in no way and never have I asserted that I was in excruciating pain during any of this." [Doc. 364-1 at 25]  The Court will assume for purposes of analysis that a reasonable jury could find that the discomfort and pain Plaintiff experienced while awaiting a circumcision was sufficiently severe as to satisfy the objective component of an Eighth Amendment claim.

Turning to the subjective component, the Court concludes that Plaintiff has not made out a submissible case that Rosales acted with deliberate indifference towards Plaintiff's medical needs. Rosales began his employment with DACDC sometime in September or October of 2007–the exact date is not clearly established in the record before the Court. [Doc. 223-11] The first

suggestion of Plaintiff's problem with his penis appears in  a health services request form dated September 26, 2007.  [Doc.  356-1 at 1]  Medical records for September 28, 2007 show that Plaintiff was seen on that date by Nurse Malcolm,[3] who prescribed a course of antibiotics and recommended a follow-up appointment with a urologist. [Doc. 356-1 at 2; Doc. 356-2 at 24 (note for 9/28/07)]   A treatment note for October 9, 2007 states that Plaintiff "completed course of Cipro," and that "foreskin & head of penis pink & healing no sign of infection.  Needs urology C. for  [unintelligible] foreskin-Hard to retract" & move back." [Doc. 356-2 at 8]  The date on which Rosales first became aware of Plaintiff's complaints of a problem with his penis is not clear. Plaintiff testified at his deposition that he believed he first saw Rosales in October 2007 [Doc. 352-1 at 10], but it is not clear whether Rosales necessarily would have seen Plaintiff for problems with his penis.  Plaintiff had other medical problems, including shoulder pain. Plaintiff's medical records for October 2007 do not include any requests for treatment of his penis. [Doc. 356-1] The next request for treatment by Plaintiff concerning his phimosis is contained in a November 23, 2007, health services request form,  in which Plaintiff refers to a "a very serious personal problem I'm having with the foreskin on my penis." [Doc. 356-1 at 4]  A medical transport  form dated November 26, 2007, establishes that Rosales verbally authorized Plaintiff's transportation to urologist Thomas Gormley on that date, so that Dr. Gormley could "Evaluate unretractable foreskin."  [Doc. 356-3 at 1]

      In his notes of his November 26, 2007 examination of Plaintiff,  Dr. Gormley diagnosed Plaintiff with "phimosis with cracking and hygiene issues," and proposed a  treatment plan consisting of antibiotic ointments, daily showers, avoiding retraction of Plaintiff's foreskin, with

---

[3]Apparently, Malcolm Miller, R.N. [Doc. 356-4 at 3]

an "eventual dorsal slit or circumcision can schedule per protocol as soon as possible." [Doc. 356-1 t 16]  At his deposition in this case, Dr. Gormley testified that Plaintiff's phimosis "could be treated conservatively or with surgery. . . I would normally, if it was me or you or anyone else, try to do it conservatively, because nobody wants to have surgery unless they have to." [Doc. 352-5 at 3]  Rosales had seen other cases of phimosis, and his own experience was that treatment with topical medications usually resolved the symptoms in a few days to weeks. [Doc. 352-4 at 2-3; Doc. 356-5 at 17]   On November 27, 2007, Rosales, consistent with Dr. Gormley's treatment plan[4] and his own experience treating phimosis, prescribed topical medications for Plaintiff's phimosis. [Doc. 356-2 at 7, 19]  From November 26, 2007 until January 15, 2008, Plaintiff's medical records do not reflect complaints about problems with his penis. [Doc. 356-1 A treatment note for December 25, 2007 contains the notation" "F/U on circumcision." [Doc. 356-3]

Plaintiff's appointment with Dr. Gormley for a circumcision was scheduled for January 15, 2008, but Plaintiff missed his appointment because of a transportation failure.  The cause of the transportation failure does not appear in the record.  Rosales testified that he had no reason to know that Plaintiff was not going to be transported to his January 15, 2008 appointment with Dr. Gormley.  [Doc. 352-4 at 7]

The Court concludes that on this record no reasonable jury could find that prior to January 15, 2008, Rosales acted with deliberate indifference to the pain and discomfort associated with Plaintiff's phimosis.  Plaintiff's complaints in late September 2007 were addressed by a course of antibiotics, which appear to have been successful. Plaintiff's medical records do not reflect complaints concerning Plaintiff's penis between October 1, 2007 and November 22, 2007. [Docs.

---

[4]Plaintiff does not maintain that the care provided by Dr. Gormely was deficient. [Doc. 364-1 at 13]

356-1; 356-2 ] When Plaintiff again complained of problems with his foreskin on November 23, 2007, [Doc. 356-1 at 4] Rosales responded by authorizing a consult with Dr. Gormley. [Doc. 356-3 at 1] Following the November 26, 2007 urology consult, Rosales provided Plaintiff with the treatment prescribed by Dr. Gormley. [Doc. 356-2 at 7, 19; Doc. 356-3 at 19-20] There is no evidence that the conservative, non-surgical treatment provided by Rosales fell below the applicable medical standard of care. Plaintiff merely has shown a disagreement with/////////// Rosales' professional medical judgment that it was appropriate to try non-surgical treatment before resorting to a circumcision. "Such a difference of opinion does not support a claim of cruel and unusual punishment." *Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993).

To the extent that Plaintiff relies on the failure to transport Plaintiff to his January 15, 2008 appointment with Dr. Gormley, Plaintiff has failed to come forward with evidence that the failure to transport was attributable to Rosales. *See e.g.*, *Horton v. Ward*, 123 Fed. Appx. 368, 373 (10th Cir. 2005) ("There is no evidence in the record indicating that either [defendant] were [sic] involved in the failure to transport plaintiff to his surgery appointment. . . ."). Unquestionably, there is an absence of evidence that would permit a reasonable jury to find that Rosales, having arranged Plaintiff's surgery, deliberately set out to sabotage Plaintiff's treatment by preventing Plaintiff's transportation to his appointment with Dr. Gormley. Further, Plaintiff cannot rely on the theory that Rosales was negligent in failing to secure Plaintiff's transportation to the January 15, 2008 appointment because an "inadvertent failure" to provide adequate medical treatment is not actionable under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 105-05 (1976).

Rosales testified that when he learned that Plaintiff had not been transported to Dr. Gormley on January 15, 2008, he "immediately" gave orders to obtain another provider for a

circumcision.  It was necessary for Rosales to obtain another provider, rather than to simply reschedule the surgery with Dr. Gormley,  because Dr. Gormley had not renewed his contract with DACDC. [Doc. 352-5 at 6] Rosales' efforts to reschedule Plaintiff's circumcision would have been further complicated by the fact that in January  2008, a private managed care provider, Prison Health Services,[5] took over as the provider of healthcare services for DACDC inmates. [Doc. 352-4 at 6]  Rosales testified that he played no role in retaining a replacement urologist and that it was up to PHS to find a replacement.  [Doc. 352-4 at 7]  A treatment note for February 26, 2008  states "cont. to wait for urologist for circumcision." [Doc. 356-2]  On or about March 13, 2008, PHS approved Plaintiff's circumcision. [Doc. 356-3 at 11-13; Doc. 352-4 at 8]  Rosales verbally authorized Plaintiff's transportation to an El Paso, Texas urologist, Murray M. Vann, M.D. [Doc. 356-3 at 8] On April 29, 2008, Plaintiff was transported  to see Dr. Vann. [Doc. 356-3 at 15] On May 14, 2008, Rosales verbally authorized Plaintiff's transportation to see Dr. Vann for "pre-op." [Doc. 356-3 at 7]  In a May 16, 2008 report, under "HISTORY OF PRESENT ILLNESS," Dr. Vann describes Plaintiff as a "40-year-old gentleman . . .seen for *semi-elective* circumcision."  [Doc. 356-2 at 1 (emphasis added)]    On May 23, 2008, Plaintiff was transported to  Thomason Hospital in El Paso, where Dr. Vann circumcised Plaintiff.

[Doc. 356-1 at 23; Doc. 356-3 at 16]  During his deposition in this case,  Dr. Vann testified that Plaintiff's  circumcision needed to be performed "in the foreseeable future, but not urgently."

[Doc. 352-6 at 8]

---

[5]Prison Health Services, Inc. is a leading provider of managed health care for prisoners. Ira P. Robbins, *Managed  Health Care in Prisons as Cruel and Unusual Punishment*, reprinted in 1 *Prisoners and the Law*  7-117, 7-120 (West 2010).

The Court concludes that no reasonable jury could find on the record before the Court that Rosales acted with deliberate indifference to Plaintiff's pain and discomfort during the period January 16, 2008 to May 23, 2008. Liability under § 1983 is predicated upon a defendant's direct personal responsibility for the deprivation of a constitutional right. *Porro v. Barnes*, 624 F.3d 1322, 1327 (10th Cir. 2010). Rosales testified that he responded to the missed January 15, 2008 appointment with Dr. Gormley by immediately giving orders to obtain another urologist. Rosales is not responsible for discomfort and pain Plaintiff experienced as the result of delays in scheduling his circumcision that are attributable to PHS's internal bureaucratic processes. *See Jurgevich v. McGary*, 63 Fed. Appx. 448, 453 (10th Cir. 2003) ("Overall, the record in this case presents evidence of reasonable responses to plaintiff's gradually increasing complaints of pain, and the inevitable bureaucratic delays associated with obtaining approval for surgery. The record does not present 'evidence . . . from which a rational trier of fact could find for [plaintiff] on his Eighth Amendment claim.'") (quoting *Adler v. Wal-mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)). To the extent he should have, but did not, anticipate that Dr. Gormley was not renewing his contract with Doña Ana County, Rosales is at most guilty of negligence. After PHS authorized treatment by Dr. Vann, Rosales authorized transportation to Dr. Vann's office on three separate occasions. These visits led up to Plaintiff's circumcision on May 23, 2008 at Thomason Hospital in El Paso. On these facts no reasonable jury could find that Rosales acted with deliberate indifference to Plaintiff's medical condition.

## IV.    Conclusion

With respect to his claim against Lt. Porter, Plaintiff has established genuine issues of material fact with respect to the first prong of the qualified immunity analysis. As to the second prong of the qualified immunity analysis, the Court finds that the law was clearly established at

the times materials to Plaintiff's retaliation claim and that no reasonable officer could have believed that it was lawful to place Plaintiff in administrative segregation in retaliation for Plaintiff's having exercised his constitutional rights by filing grievances and lawsuits concerning the conditions of his confinement.    Accordingly, summary judgment is denied as to Plaintiff's claim against Lt. Porter.

With respect to his claim against Officer McDonald , Officer Reyes and Lt. Mendoza, Plaintiff has failed to make out genuine issues of material fact that Defendants violated his Eighth Amendment rights. Accordingly, summary judgment is granted in favor of  Defendants McDonald, Reyes, and Mendoza.

With respect to his claim against Defendant Rosales, Plaintiff has filed to make out genuine issues of material that Defendant Rosales violated Plaintiff's constitutional right to adequate medical treatment.  Accordingly, summary judgment is granted in favor of Defendant Rosales.

**IT IS THEREFORE HEREBY ORDERED** that Defendants' *Motion for Summary Judgment No. I:  on the Basis of Qualified Immunity and Other Grounds* [Doc. 352]  is **denied** as to Defendant, Lt. Justin Porter;  and is **granted** as to Defendants, Officer Jeremy McDonald, Officer Malaquias Reyes, Lt. Benjamin Mendoza, and Jose Rosales, each of whom is dismissed as a defendant to this action.

**So ordered this 28th day of July, 2011**.

M. CHRISTINA ARMIJO
UNITED STATES DISTRICT JUDGE

.